## MARY HOSEA & others *vs.* GEORGE H. JACOBS, administrator, & others.

A testatrix bequeathed annuities to her husband and her son, and, on the death of the husband, gave the whole income to the son, and, on his death, to his widow and children, if any, during their lives; and then, "at the decease of said husband and son, and the widow and children of said son, if any survive him," gave all the estate to a religious society; and appointed her executors "trustees to hold the property and pay the annuities as herein provided." The son died unmarried; after which the testatrix executed a codicil, expressly confirming the will, and died, her husband surviving. *Held,* that the gift to the society was not void for remoteness; and that the society was entitled to the income accruing from the estate during the husband's life, beyond his annuity.

The Methodist Religious Society in Charlestown, having been duly organized, with nine trustees, under the St. of 1819, *c.* 111, and become popularly known as the First Methodist Episcopal Church, in 1862 chose a committee to procure a bond for a deed of a new meeting-house, and accepted their report that it could be bought for a certain sum, but the bond had not been taken because it was best for the deed to be given to another board of trustees, and afterwards sold the old meeting-house and applied the proceeds to pay debts, and its trustees held no property thereafter, but kept up a formal organization, and in 1865 their secretary wrote to the secretary of the Commonwealth in relation to the returns required by the St. of 1864, *c.* 239, that "the Methodist Religious Society has no property or income whatever, and, so far as active operations are concerned, is defunct." About the same time with the committee's report, sixteen members of the society, describing themselves as such, and including all the trustees, represented to the minister that they had organized a new one under the name of Trinity Society, and asked him to nominate trustees for it, and he declared them to be a new society, to remain under the pastoral charge of the old one till they should provide a separate place of worship, and appointed five of them, including four trustees of the old society, to be trustees, who immediately organized a corporation under the Gen. Sts. *c.* 30, §§ 43–46, and afterwards bought the meeting-house about which the committee reported, and ever since continued to act as a corporation. On April 4, 1863, at the local annual conference, by suggestion of the presiding bishop, the minister who had been stationed over the old society for two years made a certificate that twenty-eight persons, named therein, including eleven of the above described sixteen, and among them the four trustees of the old society who had been made trustees of the new one, and four others of the old trustees, had been acceptable members of the old society and were thereby discharged to form a new one to be known as the Trinity Society; and the bishop then stationed him over the society of that name, for the ensuing year, leaving the old society unsupplied; but in the statistical minutes of the conference the old society was recorded as having two hundred and ten members, and no mention was made of the new one. In February 1864 the "society or societies" which had formerly worshipped in the old meeting-house moved into the new one; and at the local annual conference in that year the name of the old society was omitted from the list of churches, and a preacher was stationed over Trinity Society, which was recorded as having a hundred and ninety-three members. But ever since 1854 the only record of baptisms, marriages and church members in either society was kept in one book, with no distinction between the two, and all the entries of church members were made in one column, headed, "List of members of the First Methodist Episcopal Church, 1854," with no mention of Trinity Society except that against the names of some of those

enumerated in the minister's certificate to the bishop, but of only one of the old trustees was written by the minister, " Removed by letter, April 5, 1863, to Trinity Church." And, at the general conference of the Methodist Episcopal Church in 1864 it was resolved that the rule of discipline requiring a superintendent not to continue a preacher in the same appointment more than two years in six appeared to have been infringed in 1863 by stationing a preacher a third year over an appointment in Charlestown, which, having changed its name and location, was substantially the same charge he had served the two years preceding. A testatrix, who in 1822 became a member of the First Methodist Episcopal Church in Charlestown, and appeared by the church records to have remained so until she died in June 1864, and who worshipped with the society in the old meeting-house and also in the new one, made a will in 1857, containing a gift to the society of that name, and by a codicil expressly ratified and confirmed the will on the day she died. *Held,* that at the time of her death a corporate body remained in existence competent to take the gift.

GRAY, J. This is a bill in equity, filed by the heirs at law and next of kin of Nancy Winchester, to enforce a resulting trust in the bulk of the income and principal of her property, real and personal, as to which the complainants contend that she died intestate.

By her will, dated October 14, 1857, she directed the payment of her debts and funeral expenses and one small legacy, and of an annuity of three hundred dollars to her husband; she gave to her son, then insane, a like annuity, but, if he should become sane, the whole income of her property, except the annuity to her husband; at the death of the husband, she gave the whole income to her son, and at his death to his widow and children, if any, during their lives. Then follows this paragraph, on the construction and effect of which the case depends.

" At the decease of my said husband and son, and the widow and children of my said son, (if any survive him,) I give, bequeath and devise all my estate, real, personal and mixed, to the First Methodist Episcopal Church in Charlestown, and to their successors, to be kept as a fund forever; the income thereof to be used and expended in the support of the Gospel in the said First Methodist Episcopal Church, the principal to be kept safely invested; and, should the executive officers of the said church find that by a sale of the whole or any part of my real estate the object of the bequest would be better promoted they are authorized to sell and convey said real estate, and invest the proceeds thereof in other real estate, or in any other safe securities, as in their judgment will be best."

The testatrix appointed two persons to be the executors of her will " and trustees to hold the property and pay the annuities as herein provided." By a codicil, dated June 24, 1864, she made a specific devise of a parcel of real estate to establish a home for aged and indigent women, and expressly ratified and confirmed her will in all other respects; and died on the same day. Her son died insane and unmarried in 1863, and her husband survived her.

The complainants, in the first place, contend that the testatrix has not undertaken to dispose of the income of her property during her husband's life, beyond his annuity, and that they as her next of kin are entitled to the same. But we are of opinion that the will clearly manifests an intention to dispose of all her property, and to give the whole of it, principal and income, (except that specifically devised to the charitable purpose mentioned in the codicil,) subject only to the provisions for the benefit of her husband and son, to the First Methodist Episcopal Church in Charlestown. In the state of things existing at the date of the codicil and of her death, the property thus given was subject only to the husband's annuity. Whether the rest of the income may be paid to that church immediately, or must be accumulated until the husband's death, we are not now required to decide.

It is next contended that the gift was void for remoteness, because it might according to the terms of the will not take effect until after the death of the son's widow and children, who might not be lives in being at the death of the testatrix. But, as to personal property, by the rule of the common law, which is equally applicable to real estate under our statutes, the will speaks from the time of the death of the testatrix. Rev. Sts. *c.* 62, § 3. Gen. Sts. *c.* 92, § 4. Before that time the death of the son unmarried and childless had made it clear that the gift to the church must take effect, at the farthest, upon the death of the husband of the testatrix; and thus, according to the weight of authority, even without regard to the statutes just mentioned, the objection of remoteness, as affecting the validity of the gift, had been removed. *Burbank* v. *Whitney*, 24 Pick. 146. 1 Jarman on Wills, (3d ed.) 257, 258. And the validity of the gift

had been put beyond doubt by the codicil, which ratified and confirmed the will, and gave it the same effect as if it had been written and executed at the date of the codicil. *Brimmer* v. *Sohier*, 1 Cush. 118. *Haven* v. *Foster*, 14 Pick. 534.

The remaining and the principal question in the case is whether, when the will and codicil took effect, there was any corporation in existence capable of taking the gift to the First Methodist Episcopal Church. The determination of this question requires a careful consideration of the facts agreed and of the records therein referred to.

By the discipline of the Methodist Episcopal Church, the preachers are stationed annually by the bishops presiding at the annual local conferences. A preacher could be reappointed but once to the same society, making two years the longest term of service with any one society, until 1864, when it was extended by the general conference to three years. This principle of "itinerancy," as it is called, is a cardinal rule of the church. By the same discipline, the property belonging to each society is vested in trustees, who are bound to admit to the pulpit the ministers duly appointed, and are elected according to the law of the state, or, in the absence of any legal requirement, in the manner prescribed by the discipline, which before 1864 was by the male members of each society upon nomination of the preacher, and since 1864 by the quarterly local conference upon like nomination; but " all trustees shall hold their office until their successors are elected." The bishops are appointed by the general conference, which is composed of clerical delegates from the annual conferences, meets every four years, and is the supreme legislative body of the church. Societies may be gathered and organized in any manner, subject only to the doctrines and discipline of the Methodist Episcopal Church.

The first society of that church in Charlestown was organized in 1819, and a board of nine trustees to manage its affairs and hold its property was incorporated on the 15th of February 1820, by St. 1819, *c.* 111. Compare Gen. Sts. *c.* 30, §§ 43, 44. The testatrix was a member of that society from 1822 until after the making of her will. That society, after 1847, (when a sec-

ond, known as the Union Methodist Episcopal Church, was formed from it), was popularly known as the High Street Church and also as the First Methodist Episcopal Church. Its trustees did not own the land on which the meeting-house stood, and became much involved in debt. It appears by their records that in July 1862 they appointed a committee to buy that land; and in September 1862 instructed the committee to devise means to raise money for that purpose, and also to ascertain at what price the Baptist meeting-house in the same street could be bought, and to obtain a bond for a deed if it could be obtained for not more than six thousand dollars; that in December 1862 the committee reported that they could not raise the necessary money to buy the land under their meeting-house, and that they could obtain the Baptist meeting-house for six thousand dollars, " and had at one time nearly completed arrangements to procure said bond, but the official members advising that a board of trustees be appointed to hold that property, they had omitted to procure a bond, thinking it best that the deed should be given directly to that board ; " and the trustees accepted this report, and voted to sell their own meeting-house and the organ therein. Such sale was made presently afterwards, and all the proceeds applied to the payment of the debts of the society ; and those trustees have since held no property, and transacted no business except to keep up a formal organization and to pass votes relating to the devise and bequest of Mrs. Winchester.

The Reverend John H. Twombly was duly appointed over the High Street Society in 1861, and again in 1862. On the 1st of December 1862, sixteen members of that society, including the nine trustees, made to him a written application in the following terms : " The undersigned, members of the above-named society under your pastoral care, believing that the interests of Methodism require the formation of a new society of said church at Charlestown, have associated together as a new society, under the name of the Trinity Society of the Methodist Episcopal Church in Charlestown; and we hereby request you to organize us into such society, and to appoint for us a board of trustees, according to the discipline and usages of our church." Upon

this application, Mr. Twombly, on the 8th of December, by a writing signed by him, declared the applicants " to be a new society of said church, as asked for; the same to remain under the pastoral charge of the High Street Society, of which the applicants have heretofore been members, until they have provided themselves with a separate place of worship;" and nominated and appointed five of the applicants, including four of the former trustees, " to be the trustees of the Trinity Society of the Methodist Episcopal Church in Charlestown;" who were immediately organized as a corporation, under the Gen. Sts. *c.* 30, §§ 43–46, purchased the meeting-house of the Baptist Society for six thousand dollars, and have since continued to act as a corporation.

The New England Annual Conference for 1863 was held at the High Street meeting-house in Charlestown in April. The friends of Mr. Twombly desired that he should be continued at Charlestown for a third year, and he was accordingly appointed by the presiding bishop over the Trinity Society, and the High Street Society was left " to be supplied." In the statistics published in the minutes of that conference, the only " stations " in Charlestown are " High Street," with two hundred and ten members, and the Union Church. During the session of the conference, on the 4th of April 1863, at the suggestion of the bishop, and as preliminary to this appointment of Mr. Twombly, a certificate was prepared and signed by him as pastor of the High Street Church, stating that twenty-eight persons therein named (of whom four were all the old trustees but one who had not been appointed trustees of the new society, and seven others had also been among the applicants for the formation of that society,) " have been acceptable members of the High Street Methodist Episcopal Church in this city, and are hereby dismissed from said church, that they may form a new ecclesiastical association, to be known as Trinity Society of the Methodist Episcopal Church, in this city." In February 1864, (in the words of the case stated,) " the society or societies " previously worshipping in the High Street Methodist meeting-house moved into the new one bought from the Baptists, and the testatrix

afterwards attended religious services there when she attended
at all.   At the annual conference in April 1864, and annually
since, a preacher was appointed for the Trinity Society, (which
appears in the statistics of the conference of 1864 with one
hundred and ninety-three members,) and none for the High
Street Society, and this society has been omitted in the list of
churches.

But the only records of baptisms, marriages and church mem-
bers in either society since 1854 have been kept in one book, in
which no distinction is made between the two societies.   The
list of church members is entitled, " The Alphabetical List of
Members in the First Methodist Episcopal Church in Charles-
town, Massachusetts, 1854," and contains in the same columns,
without division or difference, entries from that time to the pres-
ent, and no mention whatever of the Trinity Society, except
that against the names of some of those enumerated in Mr.
Twombly's certificate of April 4, 1863, but of only one of the
old trustees, is written, apparently by Mr. Twombly's hand,
" Removed by letter, April 5, 1863, to Trinity Church."   The
eight other trustees and the testatrix appear by this book to have
remained members of the First Methodist Episcopal Church to
the time of her death.   And at the general conference of the
Methodist Episcopal Church in May 1864 it was " resolved,
that in reviewing the administration of the bishops we find
that it has been eminently satisfactory, except in the following
cases, wherein the rule requiring a superintendent not to con-
tinue a preacher in the same appointment more than two years
in six appears to have been infringed, to wit:" " In 1863, in the
New England Conference, a preacher was stationed a third year
over an appointment in the city of Charlestown, which, having
changed its name and location, was substantially the same
charge which he had served the two years preceding."

Upon these facts, we are of opinion that a corporate body re-
mained in existence at the death of the testatrix, competent to
take her gift to the First Methodist Episcopal Church.   If she
rad died before the proceedings of December 1862, it is not de-
nied that the trustees incorporated under the St. of 1819 would

have taken it. Those trustees never lost their formal organization. That statute indeed required that in case of " any vacancy in the board of trustees, by reason of death, resignation, or removal from office," a suitable person, " being a member of said society," should be elected by the trustees, upon nomination of the minister having the pastoral charge of the society, to fill such vacancy; but it did not provide that any trustee, once duly elected, should cease to be a trustee oh ceasing to be a member of that society. By the ninth article of the by-laws established by the board of trustees upon its first organization, it was declared that " whenever any one of the trustees shall cease to be a member of the Methodist Religious Society in full connection, he shall cease to be a trustee, conformably to the discipline." But, by the discipline of the church, " all trustees shall hold their office until their successors are elected;" and no attempt to elect such successors was made until after the death of the testatrix in June 1864. This corporation was not therefore dissolved by the application of all its members for the formation of a new society, the appointment of four of them to be trustees of that society, and the letter of dismissal given to four of the others. It appears by their records that in March 1863 they held their annual meeting, (in which two of those who had been appointed trustees of the new society took part,) and elected a president, treasurer and secretary, according to their by-laws. The only subsequent meeting appearing by the records to have been held before the death of the testatrix is recorded under date of March 15, 1864, but following the record of a meeting in August 1864, and we have no occasion to inquire into the actual date or the validity of this record; for the only action stated in it is a vote to amend the ninth article of the by-laws " so that any member of the Methodist Episcopal Church in good standing shall be entitled to a membership in this board of trustees;" and this vote could not control or affect the rules established by the St. of 1819 and by the discipline of the church. It is equally unnecessary to examine the action of the trustees since the death of the testatrix; inasmuch as it is admitted that, if their forma organization existed at that time, it has not since been aban-

doned ; and the question now before us is only whether there is any corporation capable of receiving the gift in question, not who are the lawful members of that corporation.

It was strongly argued that, although the formal organization of the trustees had been kept up, yet they had been dissolved, and had lost their corporate existence, by the dissolution of the religious society to hold and manage the property of which was the sole object of their incorporation. But the facts of the case do not seem to us to support this position.

The application of less than twenty members of that society to their preacher in December 1862 for the formation of a new one, his declaring the applicants to be such a new society and appointing trustees for them, his certificate or letter of April 4, 1863, purporting to dismiss some of these persons and a few other members of the old society, for the purpose of forming the new society, and his entry of the same the next day upon the church records, were manifestly but parts of a scheme by which, under color and pretence of forming a new society, with the apparent connivance or approval of the bishop and the local conference, the connection of an able and popular preacher with the society might be prolonged, in evasion of a fundamental rule of their church ; and which had no further effect, except to disguise the identity of the society, and thus to obscure and jeopard their right to the gift now in question.

The only other document relied on by the complainants is the letter of the secretary of the trustees incorporated under the St. of 1819 to the secretary of the Commonwealth in December 1865, in relation to the returns required by the St. of 1864, *c.* 239, in which he says that " the Methodist Religious Society has no property or income whatever, and, so far as active operations are concerned, is defunct," and that the meeting-house and property which they formerly owned was sold two years or more previously. This statement, as applied to the corporation as whose secretary the writer made it, was strictly correct; and it has no ιegal effect as evidence of a dissolution of the religious society whose trustees they were.

On the other hand, the evidence to the contrary is decisive.

By the very terms of the pretended organization of the new society, it was to remain under the pastoral charge of the old society until it should provide itself with a separate place of worship, which it does not appear to have ever done; but all the worshippers together moved into a new meeting-house in the same street, negotiations for the purchase of which had been begun by the old society before the attempt to form a new one, and were afterwards completed by the trustees appointed for the new society. Only a very small proportion of the members ever went through any form of being dismissed from one society or organizing the other. The same persons, of whom the testatrix was one, continued to worship together, in the same manner, under the same discipline, and using the same church records.

The court is irresistibly compelled to the same conclusion which the highest authority of the church to which these worshippers belonged formed and publicly announced before the testatrix executed the codicil, and which may reasonably be supposed to have been then known to her, that this society, notwithstanding a change of name and place of worship, was substantially the same as that previously known as the First Methodist Episcopal Church in Charlestown.

As the complainants show no right or interest in any portion of the property in question, the decree must be

*Bill dismissed*

*P. W. Chandler & J. B. Thayer,* for the complainants.
*T. H. Sweetser & W. S. Gardner,* for the respondents.