ATTORNEY GENERAL *vs.* WILLIAM ARMSTRONG & others.

Suffolk. March 21, 22, 1918. — October 15, 1918.

Present: RUGG, C. J., BRALEY, DE COURCY, CROSBY, & CARROLL, JJ.

*Religious Society. Bromfield Street Methodist Episcopal Church in Boston. Trust,* Construction, Appointment and removal of trustees.

Under a deed of land to trustees to hold it forever in trust and to erect thereon a house of worship "for the use of the members of the Methodist Episcopal Church in the United States of America according to the rules and Discipline which from time to time may be agreed upon and adopted," it was *held* that the beneficiary of the trust was the local religious society which was formed in connection with the church edifice that was built by the trustees from the trust fund on land purchased for the purpose from that fund and which occupied that edifice as their place of worship from the time of its erection until its sale under legislative authority.

The religious society referred to above was called the Methodist Religious Society in Boston and comprised what formerly were two societies, merged into one and bearing the name of the original society by order of the bishop of the Methodist Episcopal Church in accordance with the discipline of that church, and it was *held* that the property rights of the Methodist Religious Society in Boston, as it was before the merger, vested in the consolidated society bearing the same name, for whose benefit it was the duty of the trustees to hold and administer the fund derived from the lawful sale of the church land and building, conforming to the rules and discipline of the church from time to time agreed upon and adopted.

The trust deed referred to above contained the provision that, when one or more of the original trustees "die or cease to be a member or members of said Church," the minister having charge of the "members of the said church" shall call a meeting for filling the vacancy and that a person eligible to election must have been a "member . . . of said Church" for one year immediately preceding. At a pre-

vious time the Supreme Judicial Court under its general chancery powers, in a suit in equity invoking its aid, had appointed a board of trustees because at that time there were no trustees chosen in accordance with the terms of the trust deed. *Held,* that this appointment of trustees by the court did not abrogate the provisions of the trust deed providing in express terms for the perpetuation of the board of trustees and did not impose forever on the court the duty of selecting and appointing trustees; and that, a board of trustees having been constituted by the court, vacancies in that board must be filled according to the terms of the trust deed, which had become operative for that purpose.

In the interpretation of a deed a significant word used according to the common and approved usage of the language, which is repeated in the same clause of the instrument, is to be understood to have been used the second time in the same rather than in a different sense.

In the case described above it was *held* that the requirement in the trust deed that a trustee must be and continue to be a member "of said Church" meant a member of the local religious society.

In the same case it appeared that by the practice of the Methodist Religious Society in Boston, as followed for many years, whenever one of the trustees ceased to be affiliated with that society, his position as trustee was treated as vacated. It appeared that two trustees, who at the time of their appointment by the court were members of the Methodist Religious Society in Boston, afterwards transferred their membership from that society to other local societies. *Held,* that, by force and effect of the trust deed, these two trustees by their change of membership had vacated their offices as trustees.

In the same case it appeared that two of the trustees appointed by the court were not members of the Methodist Religious Society in Boston, although members of the Methodist Episcopal Church, and had not joined afterwards the local society. There was nothing in the bill directed to their removal and no prayer for their removal. *Held,* that the removal of these trustees was not required.

In the same case it appeared that there was another trustee appointed by the court, who was not a member of the Methodist Episcopal Church but belonged to another denomination. At the hearing on the petition for the appointment of trustees it had been represented to the court by all parties in interest that his appointment was desired. He was the organist of the society and was one of its board of trustees. No deceit was practised on the court in regard to his appointment. It was alleged in the petition that all the persons whose appointment as trustees was requested were "members of the Methodist Episcopal Church." The fact that he was not a member was overlooked at the time, but it was known to all the other trustees and to the counsel who presented the petition and no party in interest was under any misapprehension on the subject. *Held,* that the removal of this trustee was not required.

In the same case, in regard to still another of the trustees, it appeared that he had presented to his co-trustees a bill for $809 and interest for reimbursement for an alleged expense which he had incurred in the course of his duty as a trustee, that $809 was the full amount of a claim for rent against the trustees but that this trustee had settled the claim for $277 and had taken an assignment of the claim to its full amount, and that when he presented his bill for reimbursement to the trustees he did not tell them that he had paid only $277 for the assignment. A master found that this trustee "must have known or should have known that it was improper for a person to personally profit from a fund of which he was one of the trustees." When the draft of the master's report had been com-

pleted this trustee paid back to the trustees the money thus paid to him·under the assignment. *Held,* that the conclusion of the master could not be'disturbed, and that the repayment by the trustee when the master's report was filed did not do away with the effect of his previous acts, and that this trustee must be removed.

INFORMATION IN EQUITY, filed in the Supreme Judicial Court on June 4, and amended on December 7, 1917, by the Attorney General at the relation of the members of the Methodist Religious Society in Boston, an unincorporated religious association, and of certain of the surviving trustees under the deed of William Hall Jackson to Amos Binney and others, dated March 24, 1806, and referred to in the opinion as the Jackson deed, against five of the trustees under that deed, containing the prayers which are quoted below.

The prayers of the bill were as follows:

"1. That a temporary injunction may issue from this honorable court restraining said Armstrong, Crawford, Heath, Sleeper, and Stewart, trustees under said deed of William Hall Jackson to Amos Binney and others, and each of them, until the further order of this court, from using or expending any of the proceeds of the sale of the Bromfield Street Church property, and any accumulations thereof now or at any time hereafter held or controlled by them or either of them, for any purpose other than the necessary expenses and repairs upon the real estate held by the trustees, or for payments on account of principal or interest of any mortgage thereon, or to the responsible officials of said Methodist Religious Society for its use as aforesaid.

"2. That the court will determine the rights of said Methodist Religious Society in and to the trust funds held by the trustees under the Jackson deed, and will decree that the income thereof shall be paid over from time to time to said Methodist Religious Society for its use as hereinbefore declared.

"3. That the court will decree that the provisions of said Jackson deed relative to the filling of vacancies in the number of the trustees are now in force.

"4. That the court will vacate so much of its decree of January 17, 1913, as relates to said Alvah G. Sleeper, and will remove said Sleeper from his office as trustee and direct the remaining majority trustees, Armstrong, Crawford, Heath, and Stewart, forthwith,

to meet at the call of the stationed minister to fill the vacancies upon said Board of Trustees in accordance with said Jackson deed.

"5. In the alternative, that the court will remove said Armstrong, Crawford, Heath, and Stewart, and appoint two or more suitable persons as temporary trustees, who shall meet forthwith with the remaining three trustees and elect trustees to fill the vacancies in the number of trustees in accordance with the terms of said Jackson deed, said appointed trustees to resign when the full number of nine trustees shall have been so elected.

"6. For such other and further relief as to this honorable court shall seem meet and the case may require."

And the following added by the amendment:

"7. That the places of said William Armstrong and Alexander S. Heath as trustees under said Jackson deed be declared vacant, and that their places be ordered to be filled in accordance with the terms of said deed.

"8. That the court will remove said George A. Crawford from his position as trustee under said Jackson deed."

The part of the Jackson deed creating the trust, divided by the insertion of numbers in brackets as referred to in the opinion, was as follows:

"To Have and To Hold all and singular the above mentioned and described lot or piece of ground with all the privileges thereto belonging or in any wise appertaining unto . . . for ever in trust [1] that they shall erect and build or cause to be erected and built thereon a house or place of worship for the use of the members of the Methodist Episcopal Church in the United States of America according to the rules and Discipline which from time to time may be agreed upon and adopted by the Ministers and Preachers of the said Church at their general conferences in the United States of America and [2] in further trust and confidence that they shall at all times forever hereafter permit such Ministers and Preachers belonging to the said Church as shall from time to time be duly authorized by the general conferences of the Ministers and Preachers of the said Methodist Episcopal Church, or by the yearly conferences authorized by the said general conferences and none others to preach and expound Gods Holy Word therein and [3] in further trust and confidence that as often as any one or more of the Trustees hereinbefore mentioned shall die or cease

to be a member or members of said Church according to the rules and Discipline as aforesaid then and in such case it shall be the duty of the stationed Minister or Preacher authorized as aforesaid who shall have the pastoral charge of the members of the said church to call a meeting of the remaining Trustees as soon as conveniently may be and when so met the said Minister or preacher shall proceed to nominate one or more persons to fill the place or places of him or them whose office have been vacated as aforesaid provided the person or persons so nominated shall have been one year a member or members of the said Church immediately preceding such nomination and of at least twenty-one years of age and the said Trustees so assembled shall proceed to elect and by a majority of votes shall appoint the person or persons so nominated to fill such vacancy or vacancies in order to keep up the number of nine Trustees for ever and in case of an equal number of votes for and against the said nomination the stationed Minister or Preacher shall have the casting vote. [4] Provided Nevertheless That if the said Trustees or any of them or their successors have advanced or shall advance any sum or sums of money or are or shall be responsible for any sum or sums of money on account of the said premises and they the said Trustees or their successors, be obliged to pay the said sum or sums of money, they or a majority of them shall be authorized to raise the said sum or sums of money by selling the pews in the said house when completed for that purpose subjecting the purchasers, however to the rules and Discipline of the said Methodist Episcopal Church as aforesaid forever or by a mortgage on the said premises or by selling the said premises after notice given to the Pastor or Preacher who has the oversight or charge of the Congregation attending divine services on the said premises if the money due be not paid to the said Trustees or their successors within one year after such notice given and if such sale take place the said Trustees or their successors after paying the debt and all other expenses which may be due from the money arising from such sale, shall deposit the remainder of the money arising from such sale in the hands of the Stewards belonging to or attending Divine Service on the said premises which surplus of the produce of such sale so deposited in the hands of the said stewards shall be at the disposal of the next yearly conference authorized as *as*

aforesaid which said yearly conference shall dispose of the said surplus money according to the best of their Judgment for the use of the said Society."

The case was referred to a master, who filed a report containing the findings that are stated in the opinion. The Attorney General and the defendants filed exceptions to the master's report. The case was heard upon the exceptions by *Pierce,* J., who at the request of the parties reserved it upon the pleadings, the master's report and the exceptions thereto for determination by the full court.

*J. T. Pugh,* (*W. A. Kneeland* with him,) for the relators.

*A. G. Sleeper,* for the defendants.

RUGG, C. J.   Different aspects of the present litigation have been before this court twice. In *Crawford* v. *Nies,* 220 Mass. 61, it appeared that the real estate on Bromfield Street in Boston, where formerly worshipped the Methodist Religious Society in Boston, commonly known as the Bromfield Street Society, had been sold and there was disagreement as to the persons who as trustees should hold the proceeds. Several questions there were settled. It was held in that decision (1) that a public charitable trust in perpetuity was established by the Jackson deed of 1806, (2) that by the Jackson deed the legal title to the land was vested in trustees for the use of the ecclesiastical body worshipping in the building erected thereon, (3) that the consolidation of the Methodist Religious Society in Boston with the Eighth Methodist Religious Society, under the name of the former, was legal and merged the two into a single society. It also was decided that on the record then before the court (1) there had been no termination of the trust established by the Jackson deed, and (2) that the trustees appointed by the court by decree of 1913 were entitled to the possession of the fund. It there was pointed out, however, that whether the trust created by the Jackson deed had been terminated and hence whether the church trustees had supplanted the court trustees, were questions with reference to which the record did not disclose a full trial.

After rescript but before final decree in that suit the defendants, who comprised the church trustees, the presiding bishop and others, were allowed to file a cross bill, wherein were set forth divers facts respecting the history of the Bromfield Street Church,

its establishment and maintenance, concluding with prayers that the fund should be continued in the possession of the church trustees to the exclusion of those appointed by the court. In substance and effect it was sought by the cross bill and the new facts disclosed at the full hearing thereon to secure a different conclusion from that reached on the record as it stood when the cause was first heard. The issue on the cross bill was stated in *Crawford* v. *Nies,* 224 Mass. 474, at page 482 (when that cause was here for the second time), in these words: "The question for decision is, whether upon the record now presented the order for the decree, 'that the trustees appointed by the court decree of 1913 are entitled to the proceeds of the sale of the Bromfield Street real estate and are to hold them in accordance with the trusts of the Jackson deed of 1806,' should be reversed or modified." The question as thus stated was decided after an elaborate discussion in harmony with the earlier decision. It was said at page 489: "The trustees so appointed [by the court in 1913] were officers of the court, subject to its supervision and control, and being seised of the legal title . . . and having been empowered to sell, they could make, execute and deliver a valid conveyance of the property. . . . A sale having been made, the trustees thereafter held the proceeds under the terms of the Jackson trust. . . . We have reviewed the history of this trust at much greater length than would have been desirable if the plaintiffs, [in the cross-bill] . . . had not urgently contended that the trustees under the decree should be discharged and that the alleged trustees and their successors appointed solely under ecclesiastical authority should be declared the trustees to administer the trust subject only to the rules and Discipline 'of the Methodist Episcopal Church in the United States of America.'" The final sentence of that opinion, expressive of the judgment of the court, simply ordered "that the cross bill should be dismissed." Thus it is made plain beyond peradventure that the single question then under consideration was, which board of trustees was entitled to the fund and whether it was to be held under the trusts established by the Jackson deed. The cross bill was dismissed because the plaintiffs therein were held not entitled to receive the fund and it became immaterial to inquire who the beneficiary under the Jackson deed was. *Lima* v. *Campbell,* 219 Mass. 253, 258. The cross bill having been dis-

missed, the order for a decree made by the first judgment stood, namely, that "the trustees appointed by the court decree of 1913 are entitled to the proceeds of the sale . . . and are to hold them in accordance with the trusts of the Jackson deed."

It thus is rendered apparent that no decision has been made respecting the beneficiaries under the Jackson deed. That subject has not been involved in the previous judgments and any reference to it was in connection with different matters. All that was said in each of these opinions was directed to the decision of the questions there presented. There was careful deliberation upon those points. It is the general rule that other statements in illustration of the questions actually decided are seldom considered in all their bearings and must be restricted to the propositions decided. *Swan* v. *Justices of the Superior Court*, 222 Mass. 542, 545.

It follows that the ascertainment of the beneficiaries under the Jackson deed remains for decision and is not *res judicata*. *Newburyport Institution for Savings* v. *Puffer*, 201 Mass. 41, 46. *Leverett* v. *Rivers*, 208 Mass. 241, 244. *Newhall* v. *Enterprise Mining Co.* 205 Mass. 585, 588.

It was intimated in the second opinion that under proper circumstances the Attorney General might bring proceedings concerning the further administration of the trust. It may be in consequence of that suggestion that the present proceeding was instituted. This is an information by the Attorney General brought at the relation of the Methodist Religious Society in Boston, an unincorporated religious body acting by named representatives, and of other individual members of that society and of three of the trustees appointed by the court in 1913 against all those trustees. The purpose of the information, as stated in its prayers, is (1) to determine the beneficiaries under the Jackson deed and in particular the rights thereunder of the Methodist Religious Society in Boston, (2) to enforce the provisions of the Jackson deed as to filling vacancies in the board of trustees, (3) to remove certain of the trustees.

1. The fundamental rule in the interpretation of a trust instrument is to ascertain the intent of the founders from the language employed read in the light of the contemporary circumstances, state of the law and public conditions, the object to be accomplished and all other attendant facts actually or pre-

sumably within the knowledge of the parties. The determination
of the beneficiaries of the trust created by this deed depends pri-
marily upon a correct interpretation of the words used. Those
words of the Jackson deed are printed on pages 199, 200. It is to
be observed that four specific purposes are enumerated in this
declaration of trust. These are indicated in the copy printed on
pages 199, 200 by the insertion of arabic numerals in brackets.
The first purpose is the establishment of a house of worship "for
the use of members of the Methodist Episcopal Church in the
United States of America." Although these words are free from
ambiguity, it is manifest as matter of common knowledge as well
as from the context 'in which the words occur that the ascertain-
ment of the persons who may be members of that church must
depend upon the "rules and Discipline" of the constituted au-
thorities of the ecclesiastical denomination thus described. That
matter ordinarily is within their jurisdiction. *Grosvenor* v. *United
Society of Believers*, 118 Mass. 78, 91. *Carter* v. *Papineau*, 222
Mass. 464. How such membership may be established, whether
by affiliation with separate societies only, or otherwise, and through
what instrumentalities a place of worship may be put to the use
of such members, whether through societies organized or recog-
nized by the ecclesiastical authority, or otherwise, also are ques-
tions dependent for their solution upon the "rules and Discipline"
of the church. The facts stated in this record show that mem-
bership in the church ordinarily is acquired only by membership in
a local society. While the church is regarded as single and not as
a confederation, yet its administration as an ecclesiastical denom-
ination necessarily involves the establishment of local societies
each owing fealty to the central church. Apparently no such
body is known as a general association of members of the church.
The only relation is that of members in a local society organized,
recognized and governed as to such matters as are within its juris-
diction by the central authority of the church and its subdivisions.
The words of this clause of the Jackson deed, "according to the
rules and Discipline" of the church as from time to time adopted,
modify the entire preceding phrase and afford the guide whereby
also to determine the details of "the use" of the house of worship
as well as membership in the church. This is the common gram-
matical construction. *Clarke* v. *Treasurer & Receiver General*, 226

Mass. 301, 303. Membership in the church and in the local society and the use of the church therefor are to be determined according to the "rules and Discipline" of the church.

It being true that membership in the Methodist Episcopal Church in the United States of America, so far as concerns laymen at least, exists only through membership in a local society, the first purpose stated in the trust of the Jackson deed is satisfied by treating as the beneficiaries those who are members of the local society and who as such are members of the one general church.

The second purpose of the trust, by making imperative the acceptance of such minister as may be assigned to the pulpit of the church, implies the existence of a local society to occupy the building. This power of appointing preachers to all local societies has been called "a cardinal rule of the church." *Hosea* v. *Jacobs*, 98 Mass. 65, 68. It constitutes the essential link between the general conferences of the church and the local society. This purpose of the trust expresses the obligation of the local society to acknowledge its dependence upon the central church authority for the vital matter of pulpit supply. It recognizes by inference a corresponding power respecting that matter as being reposed in that church authority. It has been held that the use of a building as a place of worship for the Methodist Episcopal Church cannot be continued after the general ecclesiastical authorities have resolved no longer to send its preachers there. *Henderson* v. *Hunter*, 59 Penn. St. 335, 342.

The third purpose of the trust relates to the selection of successive trustees to administer the trust. Reference is made to the "stationed Minister or Preacher . . . who shall have the pastoral charge of the members of the said church." The indubitable implication of these words is a local society under the ecclesiastical authority of the general church.

The fourth purpose of the trust refers among other matters to the possible sale of the church property for the payment of obligations incurred by the trustees. The local society is expressly recognized as the chief beneficiary of the trust in the provision that the yearly conference shall dispose of the surplus derived from such sale "for the use of the said Society." This last word can mean only the local society established in connection with the

edifice in question. The words "Stewards" and "Congregation" occurring in this connection point in the same direction.

Doubtless it was an inferable limitation that the society should continue to exist. But a determination as to the ultimate beneficiaries of the fund in case the local society should cease to exist is not now required because the local society continues to exist.

It was natural in 1806 for a company of church worshippers in Boston to adopt the expedient of a deed whereby the title to real estate should be taken in the names of a few persons to hold in trust so that the entire use and beneficial interest should be in the members of the society. This was due to the parochial and ecclesiastical history of the Commonwealth during the provincial and early State period. *Attorney General* v. *Federal Street Meeting-house,* 3 Gray, 1, 40. See *Parker* v. *May,* 5 Cush. 336, 349. The idea of a church building, the legal title to which stood in trustees without an accompanying society attached to it and beneficially interested in it, would have been difficult of comprehension to people in Massachusetts in 1806. *Baker* v. *Fales,* 16 Mass. 488, 504, 505. *Attorney General* v. *Merrimack Manuf. Co.* 14 Gray, 586, 602.

This analysis of the terms of the trust shows that the beneficiary under the Jackson deed was the local society, which was formed in connection with the church edifice on Bromfield Street. This is in conformity with the view expressed in a different connection in 220 Mass. at page 64.

The case has been referred to the same master who already has made two full reports in the former case and whose report now filed covers every material aspect of the facts bearing upon the question whether the beneficial interest in the land and in the fund now standing in its stead was in the society which conducted worship upon the premises or in the persons who might choose to go there to attend the services. The master has found that the first society in Boston for worship according to the doctrines of the Methodist Episcopal Church was formed in 1794. A chapel was erected in the following year. It continued to be the only church of that denomination until 1806, when its male members voted that it was expedient to erect without delay another church building in Boston for the accommodation of many who could not gain admission to the chapel because it was so small. Nine

persons, Jackson being one, were chosen as trustees to take the title to the necessary land and they were fully empowered "in behalf of this society" to purchase the land and make every needful contract to erect the church building. The trustees voted that "Bro. Jackson be authorized to purchase a suitable piece of ground whereupon to erect a chapel, making the contract in his own name and taking a deed to himself and then convey to us as trustees." The so called Jackson deed was the result of this vote. The purchase price was not paid by Jackson but by the trustees, and Jackson acted throughout as their agent. The ·Bromfield Street building was dedicated in November, 1806, and thereafter a building on that site was used continuously until its sale in 1913 as a place of worship exclusively by the same society. An original book entitled "Accounts of the Trustees of the Methodist Religious Society, Boston" was sufficiently identified and rightly received in evidence by the master. It shows some donations, but the receipts were chiefly from loans and mortgages. The Jackson deed was in the precise form prescribed by the discipline of the Methodist Church then in force except in a now immaterial particular. The church organization in 1806 was known as the "Methodist Episcopal Church in the United States of America," the last six words being a part of the title of the organization. All members of the church are members of the Methodist Episcopal Church in the United States of America, such membership being .acquired only through being joined in membership in one of the several local societies or "charges," except that bishops and travelling ministers are members of the Church and not members of any local society. Aside from this, there are no members of the Church at large who are entitled to the use of a church building of the Methodist Episcopal Church in any way other than worshipping with a local society in accordance with the discipline and rules. Although it is not certain when the name, the Methodist Religious Society in Boston, was adopted for the society using the Bromfield Street church, by whatever name or names it may have been known it is the same society whose male members in 1806 voted to buy land and build the church and which, after the edifice was erected, occupied it as a place of worship continuously until its sale in 1913.

The defendant Crawford was the plaintiff in the suit before the court in 220 Mass. 61, and his associates as court trustees and the

church trustees and others were the defendants. He alleged in his bill and the defendants by their answer admitted that the trust was for the benefit of the Methodist Religious Society in Boston. The master narrates a considerable number of other facts, including St. 1808, c. 70, and St. 1828, c. 144, all without exception showing that from the beginning it was the purpose and intent of all persons connected with the trust established by the Jackson deed, that the Methodist Religious Society in Boston was its beneficiary. His conclusion is in these words: "There is no question that the Society has had the use and benefit of the property from the time of the erection of the building until it was sold, and that until its sale it was considered by all officials of the Society including the persons who have acted as trustees and the Church authorities that the Society was entitled to all the benefits arising from the property and that it has been held and managed under the understanding that the Society had the sole beneficial interest therein." No one apparently ever has doubted that the beneficiary under the Jackson deed was that society until a considerable time after the controversy arose, of which the present information is a part.

These findings of fact must be accepted as final, since the evidence is not reported and they are consistent with each other. It is unnecessary to determine how many of them are material and competent. They all are in harmony with the terms of the trust instrument. They show that from the beginning until the present controversy all the parties in interest, both trustees and beneficiaries, have by their words and actions put a practical construction upon the meaning of the trust deed in this particular in conformity with its correct interpretation.

It appears from the master's report that the statement of trust in the Jackson deed was in the form, so far as here material, commonly adopted throughout the United States by the Methodist Episcopal Church before 1806. The determination of the beneficiary under such form of deed has come before courts of other States in numerous instances. It always has been held, in harmony with the conclusion which we have reached, that the trustees under such form of trust deed hold the church building and estate for the benefit of the local society worshipping therein. *Gibson* v. *Armstrong*, 7 B. Mon. 481. *Brooke* v. *Shacklett*, 13 Grat. 301,

314–318.  *Fair* v. *First Methodist Episcopal Church,* 12 Dick. 496. *Haskinson* v. *Pusey,* 32 Grat. 428.  *Price* v. *Methodist Episcopal Church,* 4 Ohio, 515, 546–548.  *Newman* v. *Proctor,* 10 Bush, 318, 319, 325.  *Henderson* v. *Hunter,* 57 Penn. St. 335, 340, 342. *Deepwater Railway* v. *Honaker,* 66 W. Va. 136, 141.

The beneficiary under the Jackson deed is the society known as the Methodist Religious Society in Boston. That society, as held in 220 Mass. at page 66, now comprises what formerly were two societies which have been merged into one, bearing that name by order of the bishop in accordance with the discipline of the church. It is the duty of the trustees to hold and administer the trust fund for the benefit of that society. The property rights of the Methodist Religious Society in Boston as it was before the merger follow and inhere in the consolidated society bearing the same name. It has been treated by the constituted authorities of the church as the same society. It has continued to be and is the same society in contemplation of the law. In the performance of their duty the trustees in general must conform to the rules and discipline of the church, which (to quote the words of the Jackson deed) "from time to time may be agreed upon and adopted by the Ministers and Preachers of the said Church at their general conference in the United States of America." It is manifest that these words mean the rules and discipline existent at the time the question arises, not those prevailing at the date of the deed in 1806. There is nothing at all at variance with this in *Sohier* v. *Trinity Church,* 109 Mass. 1, 23.

It is no objection to the execution of the trust that a building is now provided for the Methodist Religious Society in Boston and held by other trustees. The fund, so far as not needed for the repair and maintenance of that building, may be devoted in accordance with the rules and discipline of the church for the benefit of the society. That has been the practical interpretation of the trust through all the years. In 1808 a part of the land conveyed by the Jackson deed was sold and the proceeds applied to the general purposes of the society. The early trustees fitted up the cellar of the church for renting and later raised the building and rented stores on the first floor. The income from these sources was applied to the general expenses of the society. The master has found that "the quarterly conference is the medium which

has authority to define how and under what circumstances the use of property held under the disciplinary deed [which the Jackson deed is] shall be made available, and is the supreme authority of the local society." It must be assumed that this finding is in accordance with the rules and discipline of the church.

It follows in the opinion of a majority of the court, that the fund, representing and standing as it does in the place of the Bromfield Street real estate, must be applied to the use and benefit of the society in accordance with the rules and discipline of the church. See, in this connection, *Watson* v. *Jones*, 13 Wall. 679, 729, 730; *Trustees of Trinity Methodist Episcopal Church* v. *Harris*, 73 Conn. 216, 222, 223; *Hardy* v. *Wiley*, 87 Va. 125, 128; *Fair* v. *First Methodist Episcopal Church*, 12 Dick. 496, 499, 502; *Sanders* v. *Meredith*, 78 W. Va. 564.

2. The trust established by the Jackson deed provides by its express terms for the perpetuation of the board of trustees. The aid of the court in the exercise of its general chancery powers has been invoked twice to appoint trustees, because there were no trustees chosen in accordance with the terms of the trust deed. But, in the opinion of a majority of the court, that did not abrogate the provisions of the Jackson deed in this regard, nor impose forever thereafter on the court the duty of selecting and appointing trustees. The court has come to the assistance of the trust in order that it might not fail through want of trustees. But the terms of the trust deed are to be followed in the selection of successors to the trustees appointed by the court whenever vacancies occur. Its terms revive as soon as it becomes practicable to comply with them. A board of trustees having been constituted by the court, vacancies in that board must be filled according to the terms of the original trust instrument, which become now operative and susceptible of effective action to that end.

The qualifications of trustees prescribed by the Jackson deed are not free from doubt. It is provided that when one or more of the original trustees "die or cease to be a member or members of said Church," the minister having charge of the "members of the said church" shall call a meeting for filling the vacancy and that a person eligible to election must have been a "member . . . of said Church" for one year immediately preceding. The word "church" occurs three times in this clause of the deed. In its

second use it must refer to the local society. That is not open to question. With some hesitation we incline to the view that it has the same meaning in the other two instances. A significant word repeated in the same clause of an instrument, according to the common and approved usage of the language, should be understood to have been used in the same rather than a different sense. *Hall* v. *Hall*, 209 Mass. 350, 353. Practical considerations point to that as the preferable interpretation. Trustees to hold the title to church property naturally would be selected from the body of worshippers using that property and by whose contributions ordinarily it would be repaired and maintained. This is the interpretation adopted in *Gibson* v. *Armstrong*, 7 B. Mon. 481, 489, in which there was an able opinion by Chief Justice Thomas A. Marshall and which has been regarded as a leading case for seventy years. We are aware of no authority to the contrary. See *Brooke* v. *Shacklett*, 13 Grat. 301, 316. Since this appears to have been a form of deed in common use by the Methodist denomination throughout the country, it is desirable that harmonious construction be given to its provisions by the courts of the several States so far as may be conscientiously and rationally practicable. The practice of the Methodist Religious Society in Boston as followed for many years was in conformity with this view of its meaning. Whenever one of the trustees ceased to be affiliated with that society, his position as trustee was treated as vacated. This conception was manifested also in acts of the Legislature drafted presumably in accordance with their opinion as to existing requirements. We conclude, therefore, that eligibility to election to the board of trustees depends upon membership in the local society. It follows, also, from what has been said that when any one of the trustees who, at the time of his appointment by the court in 1913, was a member of the Methodist Religious Society in Boston, ceases to be a member of that society, he vacates his office as trustee. The result is that Heath and Armstrong, having transferred their membership from the Methodist Religious Society in Boston subsequent to their appointment as trustees to other local societies, thereby have vacated their offices as trustees, this being the force and effect of the terms of the Jackson deed.

3. Two of the trustees appointed by the court in 1913 were not

then members of the society, although members of the Methodist Episcopal Church, and they have not since joined that society. The reasons which led to their appointment are not set out in the record. The power of the court to appoint trustees is not open to doubt. Although naturally it would conform to the terms of the Jackson deed in making the appointments, there may have been conditions which rendered it impossible or not a wise exercise of its chancery power to conform precisely to its literal terms. Of course the trust would not fail even if no appropriate trustees were available possessing the qualifications specified in the deed. But, whatever may have been the circumstances leading to their appointment, there is nothing in the bill and no prayer directed to their removal.

One of the trustees appointed in 1913 by the court was not a member of the Methodist Episcopal Church but belonged to another denomination. It was represented to the court by the petitioner and all parties in interest that his appointment was desired. He made no representation personally respecting the matter. He was at that time the organist of the society and was much interested in its affairs. He was one of its board of trustees elected under the discipline of the church. No deceit was practised on the court touching his appointment. The petition was for the appointment as trustees of the board elected as trustees under the discipline. It was alleged in the petition that all the persons, whose appointment as trustees was requested, were "members of the Methodist Episcopal Church." The fact that he was not a member was overlooked at the time, but it was known to all the other trustees and to the counsel who presented the petition. No party in interest was under any misapprehension on the subject. His original appointment was valid. The court had jurisdiction of the matter and was not imposed upon as in *Sampson* v. *Sampson*, 223 Mass. 451. Under all these circumstances his removal is not required.

The grounds urged for the removal of another trustee are different. Certain members of the old Bromfield Street Society were not satisfied with its consolidation with the other society. They requested the trustees to provide a place of worship different from the church building of the consolidated society. A committee of the trustees was appointed for that purpose, of which Dr.

Crawford was chairman. He entered into a written contract for the use of rooms to that end with the trustees of Ford Hall. The ecclesiastical board of trustees then having possession of the fund refused to pay for this use. After a time the services were discontinued. The lessors then agreed with Dr. Crawford that, if payment was made for the time the rooms were actually used, no claim would be made for the unexpired term under the contract. He paid a total of $277. He took, however, from the lessors an assignment of the entire claim under the contract. He thereupon presented a bill for $809 to the treasurer of the board then having possession of the fund. The bill was not paid. After the fund was transferred to the trustees appointed by the court, he presented a bill for $809 with interest for three years and nine months, amounting to $991, and by vote of the trustees the treasurer gave him a check for that amount, which he collected. The master's further report upon this matter is in these words: "The defendant Crawford has offered no explanation of this transaction other than that the trustees of the Ford Building might have seen fit to have enforced their claim for the full amount and that he believed that under the assignment to him he was entitled to require payment of the full amount, and that he had no dishonest intention in making claim for the full amount. At the last hearing he stated, however, that, if it was determined that money had been wrongfully paid to him, he was willing to return it to the trustees. It did not appear that any of the others of the trustees knew of the amount which he had paid for the assignment nor that those who were present at the meeting and voted for the payment to Dr. Crawford made any investigation of the merits of his claim. The vote was passed without discussion. When he presented the bill for $809 to Lockwood, Dr. Crawford did not tell him that he had paid but $277 for the assignment, and in the former hearings before me when the matter of his having paid the bill for the use of the rooms and his having taken an assignment to himself was testified to it was not stated how much he had paid. After Lockwood had declined or neglected to pay the bill, Dr. Crawford placed it in the hands of counsel, but did not inform the counsel how much he had paid, nor did he turn over to him the receipted bills for what he had paid. Neither did he make before he presented his bill to Lockwood any inquiry for the purpose of ascer-

taining whether the trustees of the Ford Building had made any other use of the rooms during the remainder of the term. I am not satisfied with the explanation of Dr. Crawford in regard to this matter. He is a man of wide experience and during the time he has been involved in this long litigation has made a study of trusts and the duties of trustees, and I find that he must have known or should have known that it was improper for a person to personally profit from a fund of which he was one of the trustees. . . . After the final draft of the report had been settled the defendant Crawford has paid back to the trustees the money which had been paid to him under the assignment hereinbefore referred to." The master saw the witness and heard him testify and from such personal observation is better able to decide as to the real nature of this conduct than anybody can be from the reading of a transcript of his testimony. His conclusion under the circumstances is one which cannot be disturbed. *Parsons* v. *Parsons,* 230 Mass. 544, 552. Of course Dr. Crawford was entitled to be repaid with interest for disbursements made in the honest discharge of his duties. But it is manifestly unlawful and a gross breach of duty for a trustee to attempt to make personal profit at the expense of the trust fund by buying a claim against it at a discount and collecting it in full. See *Allen-Foster-Willett Co., petitioner,* 227 Mass. 551, 556; *Little* v. *Phipps,* 208 Mass. 331. The situation here disclosed exhibits such a disregard of the fundamental obligations of a trustee, that, notwithstanding his service in behalf of this trust, hitherto may have been valuable, he ought not longer to remain a trustee. Repayment by him after the filing of the master's report does not do away with the effect of the previous transactions.

*Decree accordingly.*