HERBERT W. EUSTACE & others, trustees, *vs.* ADAM H. DICKEY & others, trustees, & others.

Suffolk.    November 29, 30, 1920. — November 22, 1921.

Present: RUGG, C. J., BRALEY, CROSBY, CARROLL, & JENNEY, JJ.

*Trust,* Construction of instrument creating trust, Removal of trustee. *Christian Science Publishing Society.* *Equity Pleading and Practice,* Parties, Petition to intervene, Appeal. *Words,* "Expedient."

While an omission by the donor in a trust deed to express his intention as to who should control or terminate the term of office of a trustee in certain circumstances that might arise cannot be supplied by conjecture, if a reading of the trust instrument as a whole produces a conviction that, in those circumstances, a power of removal, which was not expressed by formal words, must have been intended to have been given to a certain board other than the trustees, the defect must be supplied by implication and the language of the instrument must be so moulded as to carry into effect the intention which is determined to have been sufficiently declared by the instrument as a whole.

At the time of the execution and delivery on January 25, 1898, by the founder

of Christian Science, so called, of a deed of certain goods and chattels connected with the publishing business, conducted for the preservation of the interests of Christian Science, to trustees who were to carry on that business under the name of The Christian Science Publishing Society, there were in existence two bodies, one known as the "Christian Science Board of Directors" and the other as "The First Members." The board of directors had originated by reason of a trust deed of the founder dated September 1, 1892, conveying certain real estate to four persons denominated as such a board for the building of a church edifice and the carrying on of the purposes of "The First Church of Christ, Scientist, in Boston, Massachusetts," the deed providing that they should "constitute a perpetual body or corporation under and in accordance with" Pub. Sts. c. 39, § 1. No corporation ever was organized but the church was organized as an unincorporated association on September 23, 1892, and thereafter was governed by the rules of a church manual originated and from time to time amended solely by the founder or according to her wishes. The original members of the church were called "First Members." By 1898 the directors under the manual had come to be five in number and in them were vested important functions of the church, such as, among others, the election of all officers, the appointment of missionaries, the appointment and the removal of readers of the church to conduct its services. The "First Members" at that time were limited to fifty in number and voted on the admission of candidates and certain kindred matters. The publishing society trust deed was for the expressed purpose "of more effectually promoting and extending the religion of Christian Science as taught by" the founder; its provisions empowered the trustees to manage the business on a strictly Christian basis and "upon their own responsibility and without consulting me [the founder] about details, subject only to my supervision, if I shall at any time elect to advise or direct them;" the trustees were to account for and to pay over the profits to the treasurer of the church, subject to the order of the "First Members," who were to dispose of them "only in accordance with" the manual; the trustees were given "direction and supervision of the publication of . . . literature pertaining to said business, using their best judgment as to the means of preparing and issuing the same, so as to promote the best interests of the Cause," the founder "reserving the right to make such changes as I may think important;" vacancies among the trustees were to be filled by the donor, if she so elected, otherwise by the remaining trustees, and "The First Members together with the directors of said Church shall have the power to declare vacancies in said trusteeship for such reasons as to them may seem expedient." By a series of changes in the manual extending over a period of twelve years following 1898 and directed by the founder and accepted by the entire church membership without objection, the "First Members" were abolished and ceased to exist and the entire management of the church passed into the hands of the directors, a self-perpetuating body; and a by-law, adopted at the request of the founder, provided that vacancies among the publishing society trustees might be declared by the board of directors alone. In a suit in equity brought in 1919 by the publishing society trustees against the board of directors seeking an adjudication as to the validity of action of the board in March of that year removing one of the trustees from office, it was *held,* that

(1) The language of the publishing society trust deed giving a "power to declare vacancies in said trusteeship" gave a power of removal;

(2) The single and only design of the trust deed as shown by its structure as well as by its express words was to promote and extend the religion of Christian Science as taught by its founder, and the administration of the trust must continue to be directed exclusively to the accomplishment of that object alone;

(3) A trust of the nature above described cannot be revoked or modified in the absence of a reservation by the donor of an express power to that end: it must be construed and applied according to its terms;

(4) The provision of the trust deed giving to the trustees direction and supervision of the publication of the Christian Science literature "so as to promote the best interests of the Cause, reserving the right to make such changes as I may think important," was not a reservation of a general or special power of revocation of the trust itself or of any of its terms or provisions, but gave only a right to modify and alter the publications of the publishing society;

(5) A construction of the trust deed to the effect that by its terms "First Members" were established irrevocably as an essential part of the machinery by which alone the trust could be carried out so that, upon that machinery failing, the trust would fail, should not be adopted after the trust has been established and carried out for so many years, except for compelling reasons; and no reasons compelling such a construction appeared in the record;

(6) The words, "First Members," when used in the trust deed, had no hard and fast meaning, but were used in a broad sense to designate a body connected with and forming a part of that church and to comprehend whatever body from time to time in accordance with the ecclesiastical laws of the Christian Science denomination might exercise the functions then exercised by First Members;

(7) The power of removal given by the trust deed to the "First Members together with the directors of said Church" did not cease when the "First Members" were abolished;

(8) The meaning of the provision of the trust deed giving to the "First Members together with the directors of said Church . . . the power to declare vacancies in said trusteeship," fairly interpreted with reference to the subject matter to which it relates but without varying its terms, is that those possessing the ecclesiastical functions at the time vested in "First Members" and directors should be the depositaries of the power of removal by whatever names they might be called and however their number might fluctuate according to the polity of the church; such meaning, although not expressly set forth in the deed in appropriate language, was implied by the circumstances;

(9) The vote of the "First Members" which was embodied in a by-law in the manual to the effect that the business of the church theretofore transacted by them thereafter should be done by the directors, was not an attempt to delegate the power to participate in the removal of a trustee, which had been vested in them by the publishing society trust deed, but was one step in the process of change according to the polity of the church whereby "First Members" were abolished and their duties and authorities were vested in the directors;

(10) The "First Members" being numerous and liable to constant fluctuation by reason of death and election of new members, the founder could not have placed special confidence in their discretion as individuals, so that the principle, that, when the element of personal choice is found, the exercise of the power must be confined to the person or persons selected and is not transmissible, has no application;

(11) The power conferred upon the "First Members together with the direc-

tors of said Church . . . to declare vacancies in said trusteeship for such reasons.
as to them may seem expedient" imposed a continuing duty upon those two.
classes of church functionaries and upon the church functionaries who succeeded.
to their powers and trust obligations, to maintain a certain intimacy of knowl-
edge as to the work of the trustees in order to be able constantly to act intel-
ligently, and was a power coupled with a trust;

(12) By reason of the fact that the organization of the church in accordance
with its polity has consolidated those powers, previously shared by the "First.
Members" and by the directors in concurrence, and has placed them wholly
in the directors, the power of removal of the trustees by the words of the trust
deed, interpreted according to their true meaning, has survived and has become
vested in the Christian Science Board of Directors;

(13) The words, "directors of said church," as they are used in the publish-·
ing society trust deed, do not refer to the board established by the deed of
September 1, 1892, but to the officers constituting the ecclesiastical board of
directors under the polity of the church;

(14) The Christian Science Board of Directors, in 1919 composed of five-
members, had the power, if they acted in accordance with law and with the
terms of the publishing society trust deed, to effect the removal of a trustee·
holding office under that deed;

(15) The words of the trust deed, that vacancies in the trusteeship might.
be declared by the designated church authorities "for such reasons as to them
may seem expedient," mean that the genuine judgment of the designated author--
ities, when honestly exercised, is to prevail; and the discretion thus given to·
them, when applied in good faith, is not subject to re-examination by a court
in respect to its wisdom;

(16) The function of a court, upon a bill in equity seeking an adjudication
as to the validity of a removal of a trustee by the Christian Science Board of
Directors under the provisions of the deed above ·described, is to ascertain
whether the terms of the trust have been observed, whether the proceedings.
have been regular, whether the cause assigned is one sufficient to warrant re-
moval, whether fair opportunity has been accorded to the trustee to present.
his side of the matter so as to satisfy the requirements of natural justice, whether·
the decision is within the scope of the power conferred and whether the final;
action appears to have been in the exercise of good faith and of an honest judg-
ment or to have been arbitrary and lacking in the ordinary elements of fairness;.

(17) It was not a capricious nor an arbitrary exercise of power for the di-·
rectors to determine that, because a radical difference of opinion as to the inter-
pretation of the Church Manual existed between them and the trustees, the:
welfare of the trust required the removal of one of the trustees;

(18) The mere fact, that the same grounds warranted the removal of all of·
the trustees, did not require a finding that the directors acted capriciously in:
removing one only of them;

(19) A finding of a master, who heard the suit, that one reason assigned by
the directors which required the removal of one rather than of all of the trustees
"may be said" not to have been "assigned in good faith. But that the Direc-
tors who adopted the resolution honestly believed themselves to be exercising
a power belonging to them, and for sufficient reasons whether those assigned
or not, I find no reason to doubt," was a finding of good faith on the part of the
directors as to all the reasons stated except the one designated and is not a find-

ing that the other reasons given by the directors were tainted or affected by the one designated;

(20) The reasons honestly assigned by the directors being such as, within the power vested in them, warranted them in making a removal, their honest judgment upon the question of expediency and not that of any other body or magistrate must prevail under the provisions of the trust deed;

(21) While ordinarily a trustee, whose conduct is called in question, ought to be given an opportunity to be heard in his own defence, in the circumstances the lack of a formal hearing was not decisive against the validity of the removal because it appeared from the record that a controversy of long duration between the trustees and the directors had brought out clearly the points of difference between them and that the grounds upon which the trustee was removed had been fully debated orally and in writing and that his point of view and contentions had been stated forcibly and at length;

(22) It was not necessary under the provisions of the trust deed that the vote of the Christian Science Board of Directors so removing a trustee be unanimous;

(23) It appearing that four of the five members of the Christian Science Board of Directors were present when the vote of removal of the trustee was adopted, and that three voted therefor, and that the vote was sufficient in form, the vote was valid.

A petition by the Attorney General for leave to intervene in the suit above described was denied and no exception to such denial was saved nor appeal taken. At the argument of the suit before this court upon a reservation by a single justice, the petition of the Attorney General formed no part of the record, but he filed a suggestion that the court was without jurisdiction to determine the issues raised on the record or to enter a final decree, on the ground that the suit related to a public charitable trust or trusts and that the Attorney General as the representative of the public beneficiaries was a party essential to jurisdiction over the subject. *Held,* that

(1) The questions, whether the Attorney General might be a proper party or whether in the exercise of judicial discretion he ought to be permitted to become a party were not presented;

(2) The court had jurisdiction of the suit without the Attorney General being made a party;

(3) In the suggestion filed by the Attorney General there was involved no question either under the Constitution of the Commonwealth or under the Fourteenth Amendment to the Federal Constitution.

Certain individual members of "The First Church of Christ, Scientist, of Boston, Massachusetts," who were not parties in the suit above described, thirty-one days after the filing of the master's report filed a petition, on behalf of themselves and of such other members as might elect to come in, for leave to file exceptions based upon certain objections which had been duly filed with the master by the defendants, but as to which the defendants had not filed exceptions within the time allowed by Equity Rules 31 and 32. About six months later and two months after the suit had been reserved for determination by this court, the same parties filed also a petition for leave to intervene and to file the same exceptions. Both petitions were denied. *Held,* that the petitions properly were denied, both as a matter of right and as a matter of discretion, and that in the circumstances the petitioners had no right of appeal.

BILL IN EQUITY, filed in the Supreme Judicial Court on March 25, 1919, and afterwards amended, by Herbert W. Eustace, David B. Ogden and Lamont Rowlands, alleged therein to be trustees under a deed of Mary Baker G. Eddy dated January 25, 1898, constituting a trust to be carried on under the unincorporated name, "The Christian Science Publishing Society," against Adam H. Dickey, James A. Neal, Edward A. Merritt and William R. Rathvon, alleged to be trustees under a deed of trust by Mary Baker G. Eddy dated September 1, 1892, and an amendatory deed of March 19, 1903, and also to be directors of The First Church of Christ, Scientist, in Boston, Massachusetts, and also against John V. Dittemore and Annie M. Knott, each of whom, the plaintiffs alleged, claimed "to hold the position and office of Trustee and Director in association with the other defendants." The substance of the prayers of the bill was that a resolution adopted by the defendant directors on March 18, 1919, purporting to remove the plaintiff Rowlands as trustee of The Christian Science Publishing Society and to declare the trusteeship vacant, be adjudged nugatory and of no legal effect, and that the defendants be restrained from committing acts in conformity with such resolution.

The defendant Dittemore filed a separate answer, in which he alleged in substance that the removal of all of the plaintiff trustees was warranted by their conduct; that, if the defendant directors technically did not have power so to do, the court should do so; and he left it to the court to decide whether the dismissal of the plaintiff Rowlands, as done by resolution of the other defendants, was effectual. He further alleged that the other directors illegally and without warrant had removed him, Dittemore, from office as a director and had elected the defendant Knott in his stead. The other defendants joined in an answer, denying such allegations of the bill as asserted that their action in removing the plaintiff Rowlands as a trustee was without power or warrant and alleging the contrary.

By the deed of January 25, 1898, which is the basis of the bill, Mary Baker G. Eddy conveyed to the plaintiffs' predecessors, "in consideration of one dollar . . . and in consideration of their agreement to faithfully observe and perform all the conditions hereinafter specified to be by them observed and performed,

and for the purpose of more effectually promoting and extending the religion of Christian Science as taught by me, do hereby sell and convey to them, the said Bates, Neal and McKenzie, and their successors in the trust hereinafter established all and singular the personal property, goods, and chattels which were sold and conveyed to me by the Christian Science Publishing Society by its bill of sale dated January 21st, 1898, said property being located in the premises numbered 95 and 97 Falmouth Street in said Boston, including the publication called 'The Christian Science Journal,' (not including the copyrights thereof), the linotype, all pamphlets, tracts, and other literature conveyed to me by said bill of sale, the Hymnal, the subscription lists of 'The Christian Science Journal' and of 'The Christian Science Quarterly,' all stationary fixtures, stock on hand manufactured or otherwise, machinery, tools, mailing lists, book accounts, notes, drafts, checks and bills, whether in process of collection or not, five United States bonds of one thousand dollars each, all cash and bank accounts and all personal property of whatsoever kind or nature which belonged to said Society and which were conveyed to me as aforesaid, excepting only such of said property as may have been used and disposed of since the date of said sale to me, [the succeeding nine words were underlined in the original deed] upon the following perpetual and irrevocable trust and confidence, namely:

"1. Said trustees shall hold and manage said property and property rights exclusively for the purpose of carrying on the business, which has been heretofore conducted by the said Christian Science Publishing Society, in promoting the interests of Christian Science; and the principal place of business shall be in said Boston.

"2. The business shall be done by said trustees under the unincorporated name of 'The Christian Science Publishing Society.'

"3. Said trustees shall energetically and judiciously manage the business of the Publishing Society on a strictly Christian basis, and upon their own responsibility, and without consulting me about details, subject only to my supervision, if I shall at any time elect to advise or direct them.

"4. Said trustees shall keep accurate books of account of all the business done by them, and shall deposit in a responsible and reliable Bank or Trust Company all bonds, mortgages, deeds,

and other documents or writings obligatory of every kind and nature for safe keeping; also all surplus funds over and above the sum necessary to defray the running expenses of the business, until the same shall be paid over to the Church Treasurer, as herein provided. No papers or monies shall be taken from said Bank or Trust Company excepting by and in the presence of a majority of said Trustees. Once in every six months the trustees shall account for and pay over to the treasurer of 'The First Church of Christ, Scientist, in Boston, Mass.,' the entire net profits of said business. The 'net profits' shall be understood to mean the balance remaining at the end of each six months after paying the usual and legitimate expenses incurred in conducting the business. No authority is intended to be conferred upon the trustees to expend the money of the trust for property not necessary for the immediate successful prosecution of the business, or to invest the same for purpose of speculation, or to incur liabilities beyond their ability to liquidate promptly from the current income of the business. Said treasurer shall hold the money so paid over to him subject to the order of 'The First Members' of said Church, who are authorized to order its disposition only in accordance with the rules and by-laws contained in the Manual of said Church.

"5. The business manager shall present to the Trustees, at the end of each month, a full and correct statement of the receipts and expenditures of the month.

"6. Said Trustees shall employ all the help necessary to the proper conduct of said business, and shall discharge the same in their discretion or according to the needs of the business, excepting that the business manager may call in at times of necessity such temporary help as will facilitate the business.

"7. The Trustees shall employ such number of persons as they may deem necessary to prepare Bible Lessons or Lesson Sermons to be read in the Christian Science churches, the same to be published Quarterly as has heretofore been done by and in the name of the Christian Science Quarterly; and they may, in their discretion, change the name or style of such Quarterly publication as occasion may demand. They shall also fix the compensation of the persons so selected.

"8. Said Trustees shall have direction and supervision of the

publication of said Quarterly, and also of all pamphlets, tracts, and other literature pertaining to said business, using their best judgment as to the means of preparing and issuing the same, so as to promote the best interests of the Cause, reserving the right to make such changes as I may think important.

"9. Said trustees and their successors in trust shall not be eligible to said trusteeship or to continue in the same, unless they are loyal, faithful, and consistent believers and advocates of the principles of Christian Science as taught by me in my book, 'Science and Health with Key to the Scriptures.'

"10. Whenever a vacancy shall occur in said trusteeship for any cause, I reserve the right to fill the same by appointment, if I shall so desire, so long as I may live; but if I do not elect to exercise this right, the remaining trustees shall fill said vacancy. The First Members together with the directors of said Church shall have the power to declare vacancies in said trusteeship for such reasons as to them may seem expedient.

"11. I also reserve the right to withdraw from said trust, if I shall so desire, the publication of the Christian Science Journal, but if I do not exercise this reserved option, then said Journal shall remain a part of the trust property forever.

"12. Upon my decease, in consideration aforesaid, I sell and convey to said trustees my copyright of 'The Christian Science Journal,' to be held by them as the other property of said trust.

"13. Said trustees shall each receive annually one thousand dollars for their services in that capacity, payable semiannually in payments of five hundred dollars, or such salary as the said Church may determine from time to time.

"14. The delivery of this instrument to, and its acceptance by, said trustees shall be regarded as the full establishment of the trust and as the agreement by the trustees to honestly and faithfully do and perform all things to be done and performed by them within the terms, objects and purposes of this instrument."

The suit was referred to a master "to hear the parties and their evidence, to find the facts, and report the same to the court."

It appeared from the master's report that on April 29, 1919, John V. Dittemore brought a bill in equity against the other five defendants in this suit, which was ordered by the court to be referred to the same master and to be heard with this suit.

As to that suit, the master reported: " Much of the evidence at the hearings was offered in both cases. This is dealt with in the present report, in its relation to the issues raised by the pleadings in [this suit of Eustace *v.* Dickey]. It is understood that further evidence remains to be heard in the case [Dittemore *v.* Dickey] should the parties so desire, upon such of the issues raised therein as may remain open after the determination of those raised in the present case."

The master's conclusions were, in substance, "that Rowlands' removal was not lawfully effected by the . . . resolution adopted on March 17, 1919; and that he is still a trustee under Mrs. Eddy's deed of January 25, 1898, notwithstanding said resolution." "Against the objection of all the defendants except Dittemore, and subject to their exception," he also "ruled that the issue whether or not Dittemore was a director when the bill was filed was an issue of fact upon which the master was" to pass in the present case; and on this subject he found, as a conclusion from other facts reported by him, "that not only was the vote purporting to dismiss Dittemore ineffectual for the purpose of removing him from his trusteeship under Mrs. Eddy's deed of September 1, 1892; but that it was also ineffectual for the purpose of dismissing him as a member of the board of five directors, authorized since 1903, by the by-laws and the acquiescence therein of the church membership, to perform functions other than those belonging to the trustees under said deed. It follows that no vacancy was created by said vote, and that Mrs. Knott did not lawfully become either a trustee under said deed or a member of said board of directors in Dittemore's place."

Other material facts found by the master and contentions raised by the defendants by exceptions to the report are described in the opinion.

The master gave notice to counsel of the preparation of his draft report on December 20, 1919. The defendants other than Dittemore moved before the master and on February 14, 1920, before *Crosby*, J., that the master hear all the evidence relating to the issue as to Dittemore's holding of office before filing his report. The motion was denied on March 1, 1920; and the defendants other than Dittemore appealed therefrom.

On March 1, 1920, Emelie B. Hulin of the city and State of New York "in behalf of herself and all other members of the First Church of Christ, Scientist, of Boston, known as The Mother Church, in good standing, and all members of Christian Science churches and associations and all other Christian Scientists," moved "to intervene," seeking an adjudication as to whether the directors had power to remove the plaintiff trustees, and, if they had no such power, that the court should remove the trustees. The motion was heard by *De Courcy*, J., and was denied; and the petitioners alleged exceptions. These exceptions afterwards were waived at the argument before this court.

On March 6, 1920, the master's report was filed. On March 25, 1920, Daisy Lovering Krauthoff and Edwin A. Krauthoff presented to the clerk of the Supreme Judicial Court for the county of Suffolk for filing a document in which they alleged that they were "members in good standing of the First Church of Christ, Scientist, in Boston, Massachusetts, and" were acting "on behalf of themselves and all other members of said church who may desire to join in this effort to uphold the manual thereof," and that the master had been requested to make the following finding: "86a. The religion of Christian Science as taught by Mary Baker Eddy in her text book, Science and Health with Key to the Scriptures, includes within its principles, a faithful, loyal and consistent adherence and obedience to the Church Manual of The First Church of Christ, Scientist, in Boston, Massachusetts, both according to the letter and the spirit thereof;" that the master had decided the finding to be immaterial and had refused to make it, and that, while the defendant directors had filed an objection to such action of the master, they had not filed an exception thereto; and the petitioners moved that .the report be recommitted to the master "with directions to consider such request as one material to be determined, and, if he fails to find as stated herein, that the master report to the court the testimony and evidence bearing on such issue." On the same day the same parties, in the same capacities, presented for filing certain exceptions to the master's report based on objections previously filed by the defendant directors. On April 6, 1920, the same parties, acting in the same capacities, alleging that they had not been advised of the failure of the defendants to file the exceptions above described

until March 25, 1920, and "were not advised of their refusal to do so until April 1, 1920," presented a petition for leave to file the motion to recommit and the exceptions above described, referred to a bill in equity brought by them on March 31, 1920, against the Attorney General and others (see *post*, 88), and also moved that the report of the master be recommitted and that "the further consideration of the exceptions on file herein be postponed until" their suit against the Attorney General and others "is ready for final decree." This petition was heard by *Pierce*, J., and by his order on April 9, 1920, an interlocutory decree was entered denying it, from which the petitioners appealed on April 27.

On August 16, 1920, by *Pierce*, J., this suit was "reserved and reported for determination by the full court on the pleadings, the master's report, and the defendants' exceptions thereto; and at the further request of all parties" he "caused to be printed and sent up with this reservation the appeal from the order denying the motion of the defendants other than Dittemore to direct the master to hear further evidence before filing any report, it being the only other outstanding interlocutory matter."

On October 20, 1920, Daisy Lovering Krauthoff and Edwin A. Krauthoff, acting in the same capacities as previously, filed in the Supreme Judicial Court for the county of Suffolk a petition for leave "to become parties to this suit with leave to take such steps therein as the court may allow, and especially" for "leave upon being made such parties to refile the several motions and exceptions hereinbefore filed by" them "with the clerk of this court in this cause." The petition was heard by *Pierce*, J., and by his order an interlocutory decree was entered denying it. The petitioners appealed.

*J. L. Bates*, (*L. M. Abbott, W. A. Dane, C. P. Smith & R. E. Buffum* with him,) for the Christian Science Board of Directors.

*W. G. Thompson*, (*F. S. Streeter* of New Hampshire, *F. C. Demond & G. E. Mears* with him,) for Dittemore.

*C. E. Hughes* of New York, (*S. L. Whipple, L. Withington, S. H. Strawn & R. H. Hollen* with him,) for the plaintiffs.

*E. A. Krauthoff & D. L. Krauthoff, pro se.*

*J. W. Allen*, Attorney General, & *C. F. Choate, Jr.*, Special Assistant Attorney General, (*E. H. Abbot, Jr.*, Assistant Attorney General, with them,) for the Attorney General.

RUGG, C. J.  This is a suit in equity.  The plaintiffs are three persons, who by succession are trustees under a deed of trust executed by Mary Baker G. Eddy, the founder of "Christian Science" so called, as donor, on January 25, 1898, to three persons therein named as trustees.  The defendants are four persons alleged to be trustees under another deed of trust executed by Mrs. Eddy dated September 1, 1892, and also to be Directors of The First Church of Christ, Scientist, in Boston, Massachusetts, and two other persons, each alleged to be claiming to be a trustee and director in association with the other four.  The basic question is whether the defendants have power to remove one of the plaintiffs from the position of trustee.

The answer to that question depends upon the true interpretation of these deeds of trust executed by Mrs. Eddy and whatever other matters rightly may be considered in ascertaining their meaning.

The deed of Mrs. Eddy of January 25, 1898, whereby were created the trusts hitherto administered by the plaintiffs, hereinafter called the trust deed, related wholly to personal property. The declared object of that trust, recited in the early part of the trust deed, is "for the purpose of more effectually promoting and extending the religion of Christian Science as taught by me."  It transferred title to certain goods and chattels connected with the publishing business conducted for the promotion of the interests of Christian Science, which theretofore had been carried on by a corporation called The Christian Science Publishing Society.  The grantees were three individuals, who accepted the transfer upon the trusts set forth in the deed.  These are stated in paragraphs numbered from 1 to 14, both inclusive.  The first of these requires the trustees to use the property exclusively for carrying on the business, which had been conducted by The Christian Science Publishing Society, "in promoting the interests of Christian Science."  Among these trusts were provisions to the effect that the trustees should energetically and judiciously manage the publishing business under the unincorporated name of "The Christian Science Publishing Society" on a strictly Christian basis and "upon their own responsibility, and without consulting me [Mrs. Eddy] about details, subject only to my supervision, if I shall at any time elect to advise or direct them,"

should account for and pay over the profits of the business every six months to the treasurer of The First Church of Christ, Scientist, in Boston, Massachusetts, subject to the order of "The First Members" of said church, who were empowered to make the final disposition "only in accordance with the rules and by-laws contained in the Manual of said Church," and should employ and fix compensation of necessary help, assistance and persons to conduct the business and "to prepare Bible Lessons or Lesson Sermons to be read in the Christian Science churches." The annual compensation of the trustees was to be $1,000 each "or such salary as the said Church may determine from time to time." The trustees were required at all times to be "loyal, faithful, and consistent believers and advocates of the principles of Christian Science as taught by me in my book." Clause 8 of the trust deed is in these words: "Said Trustees shall have direction and supervision of the publication of said Quarterly, and also of all pamphlets, tracts, and other literature pertaining to said business, using their best judgment as to the means of preparing and issuing the same, so as to promote the best interests of the Cause, reserving the right to make such changes as I may think important." In clause 10 of the trust deed, it is provided that vacancies among the trustees should be filled by the donor, if she so elected, otherwise by the remaining trustees, and that "The First Members together with the directors of said Church shall have the power to declare vacancies in said trusteeship for such reasons as to them may seem expedient."

· The facts are found by the master, in the light of which these words of this trust deed must be interpreted. Mrs. Eddy founded Christian Science. In 1879 she organized a church and became its pastor. In 1892 she reorganized the church. Under date of the first of September of that year she conveyed to four persons "as trustees as hereinafter provided and to their legitimate successors in office forever" land in Boston upon which within five years they were required to build a church edifice. It was provided that the "grantees shall be known as the 'Christian Science Board of Directors.'" Thus that board first was constituted. "The First Church of Christ, Scientist," was not organized until September 23, 1892. The deed declared that the grantees should "constitute a perpetual body or corporation under and in ac-

cordance with section one, Chapter 39 of the Public Statutes of Massachusetts." The master has found that the grantees never organized themselves as a corporation and never became such by virtue of their duties or similarity to deacons and wardens. The mere declaration of the grantor could not make them a corporation.

The directors were required, upon the completion of the church building, to "elect a pastor, reader or speaker to fill the pulpit who shall be a genuine Christian Scientist," to maintain public worship in accordance with the doctrines of Christian Science in said church, and to that end they were "fully empowered to make any and all necessary rules and regulations." The directors were enjoined not to allow in the church building any preaching or other religious services not consonant and in strict harmony with the doctrines and practice of Christian Science as taught and explained by Mrs. Eddy. The directors also were required to maintain regular preaching, reading or speaking in the church on each Sabbath and to rebuild the church under conditions named. The number of directors named in the deed of September 1, 1892, was four. In addition to the duties imposed on them by that deed, they have exercised other powers and performed additional functions, assigned to them by the Church Manual, all of a highly important nature and covering a wide field. There was no rule fixing their number until February, 1903, when a by-law was adopted, which has since continued in force, establishing their number at five. By the name "Christian Science Board of Directors" originally the four persons named as trustees by the deed of September 1, 1892, were described. As often, if not universally, used thereafter in the Church Manual, that name designates the board of five exercising powers and performing functions not derived from the deed but from the Church Manual.

The master also has found that the church has never become incorporated but has continued from the first an unincorporated religious association. It has worshipped regularly to the present in the edifice erected by the directors. "The First Church of Christ, Scientist, in Boston, Massachusetts," was organized on September 23, 1892, by eleven persons among whom were the four named as trustees and constituted directors in the deed of September 1, 1892. These eleven persons together with one other were

voted to be "First Members of the First Church of Christ, Scientist." Others designated as "First Members" were added from time to time by vote of "First Members." The voting power in the church always has been confined according to its polity to "First Members." Members of the church had no voting power. The First Church of Christ, Scientist, at the instance of the founder first adopted rules and by-laws in 1895. These were radically changed from time to time during the life of Mrs. Eddy and many different editions of them called the "Church Manual" have been published. In every edition the names of the Christian Science Board of Directors have been printed under the caption "Church Officers" together with the names of other officers of the church. This is true of those editions issued before January 25, 1898. At that time important functions of the church, such as the election of all officers, the appointment of missionaries, the appointment and removal of readers of the church to conduct its services, amongst others, were vested in the board of directors by the Church Manual. Although it was not until 1908 that a by-law of the church expressly included a board of directors among the officers, it always has been provided by a by-law that all officers of the church should be elected by the board of directors.

The provisions respecting First Members in force at the time of the trust deed of January 25, 1898, were that their regular meetings were to be held semiannually, that they should vote on the admission of candidates and attend to the transaction of any church business that properly might come before them. Their number should not be permitted to fall below forty and seven constituted a quorum. It was provided in the Church Manual of 1898 that the number of "First Members" should not exceed fifty, and in several subsequent editions one hundred was fixed as the maximum number.

Subsequent events have introduced new factors with reference to which the trust deed must now be applied. In January, 1901, the First Members adopted a by-law providing that "The business of the Mother Church [another name by which The First Church of Christ, Scientist, was known] hitherto transacted by the First Members, shall be done by its 'Christian Science Board of Directors.'" This by-law was accepted and acted upon forthwith by

the entire church membership without objection, and has so continued to be observed until the present. Almost immediately after the adoption of this by-law, at Mrs. Eddy's request or with her approval, a by-law, to the effect that vacancies among the trustees of the Christian Science Publishing Society (the trustees created by the trust deed of January 25, 1898) might be declared by the First Members and the directors, was changed so as to vest that power exclusively in the Christian Science Board of Directors. Every by-law or amendment since adopted was transmitted by Mrs. Eddy to the Board of Directors alone, by whom it was adopted. It is manifest that this procedure had the approval of Mrs. Eddy. After January, 1901, the First Members never undertook to transact any business of the church and no new First Members were elected. In 1903, a by-law was adopted by the Board of Directors changing the name of "First Members" to "Executive Members" and in 1908, another by-law was adopted repealing all provisions concerning Executive Members and providing that "there being no further necessity for their organization, they shall be and hereby are disbanded." This occurred about two years before the passing on of Mrs. Eddy, and was approved, if not originated, by her. There has been no objection nor protest to this. No meetings of First or Executive members have been held since that time. There has been continuous acquiescence in the binding force of this by-law by the entire membership of the church. All by-laws and provisions of the Church Manual were adopted during the life of Mrs. Eddy and substantially every one was suggested or proposed for adoption by her. So far as concerns the government of the church, treating it as an ecclesiastical organization, the First Members, who alone had voting power, have been abolished and have ceased to exist and the entire management has passed into the hands of the directors, a self-perpetuating body, all this at the suggestion and with the approval of Mrs. Eddy.

The Church Manual in force in January, 1898, bore upon its title page "Church Manual of the First Church of Christ, Scientist in Boston Massachusetts by Mary Baker G. Eddy." With slight modifications, this has continued to be the title page of every edition of the Church Manual. The last several editions issued during the life of Mrs. Eddy contained provision that "This

Manual shall not be revised without the written consent of its author." Since the Church Manual on its face purports to be the work of Mrs. Eddy as author and the master has found it to be proved that substantially all its provisions were suggested or proposed by her, it is apparent that there can now, since the decease of Mrs. Eddy, be no change in the provisions of the Church Manual in accordance with its terms.

The trust deed made provision for the removal of a trustee by the concurrent action of the "First Members" and the directors of the church. That is the effect of the clause conferring upon them "the power to declare vacancies in said trusteeship for such reasons as to them may seem expedient." In this context, the power to declare a vacancy is the equivalent of the power of removal.

The precise question to be decided is whether under these circumstances one of the trustees can be removed by the board of directors, since the "First Members" have been deprived of all ecclesiastical power and have been disbanded in accordance with the polity of the church.

Every instrument in writing, although it cannot be varied or controlled by extrinsic evidence, must be interpreted with a view to all the material circumstances of the parties at the time of its execution, in the light of the pertinent facts within the knowledge of those who signed it and in such manner as to give effect to the main end designed to be accomplished by the instrument. *Best* v. *Berry,* 189 Mass. 510. *Polsey* v. *Newton,* 199 Mass. 450. *Simonds* v. *Simonds,* 199 Mass. 552. *Cotting* v. *Boston,* 201 Mass. 97. *Bullard* v. *Leach,* 213 Mass. 117. *Tax Commissioner* v. *Putnam,* 227 Mass. 522, 523, 524. *Attorney General* v. *Methuen,* 236 Mass. 564, 573. It is a cardinal rule in the interpretation of trust instruments that they are to be so construed as to give effect to the intent of the founder of the trust as manifested by the words used in the light of all the surrounding facts, unless inconsistent with some rule of law or repugnant to the terms of the instrument. *McCurdy* v. *McCallum,* 186 Mass. 464, 469. *Ware* v. *Minot,* 202 Mass. 512. *Taft* v. *Stearns,* 234 Mass. 273, 277. The decision of the question concerning any trust instrument depends upon the intention of the founder as manifested by the words used. An omission to express an intention cannot be supplied by conjecture.

But if a reading of the whole trust instrument produces a conviction that a particular interest or power must have been intended to have been given not expressed by formal words, the court must supply the defect by implication, and so mould the language of the founder of the trust as to carry into effect the intention which it is of opinion has by the instrument as a whole been sufficiently declared. This principle has been chiefly invoked in the interpretation of wills but is equally applicable to a trust deed like that here involved. *Metcalf* v. *Framingham Parish*, 128 Mass. 370, 374. *Boston Safe Deposit & Trust Co.* v. *Coffin*, 152 Mass. 95, 100. *Sanger* v. *Bourke*, 209 Mass. 481, 486. *Tibbetts* v. *Tomkinson*, 217 Mass. 244, 252. *Lamb* v. *Jordan*, 233 Mass. 335, 340.

The trust deed now under consideration must be construed and interpreted according to these principles. The avowed purpose of the trust deed of January 25, 1898, was for "more effectually promoting and extending the religion of Christian Science." The business of publishing was to be conducted "in promoting the interests of Christian Science." The profits derived from that business were to be paid to the treasurer of the church who was authorized to dispose of it only in accordance with the manual of the church. Preparation of religious publications is the chief business of the trustees.

It is manifest from the structure of the trust deed as well as from its express words that the single and only design of the founder was to promote and extend the religion of Christian Science as taught by Mrs. Eddy. Every part of the trust deed re-enforces and makes even more plain the avowed purpose of Mrs. Eddy that her sole and completely dominating aim in establishing the trust was to promote and extend the religion of Christian Science as taught by her. The administration of the trust must continue to be directed exclusively to the accomplishment of that object alone.

A trust of that nature cannot be revoked or modified in the absence of reservation of an express power to that end by the donor. *Thorp* v. *Lund*, 227 Mass. 474. The deed in question created a trust complete in itself. By its own phrase it was declared to be upon the "perpetual and irrevocable trust and confidence" therein set out. The delivery by the donor of the trust deed and of the property thereby transferred and the acceptance thereof by

the grantees and the performance by them of the trust thereby established was an executed trust. It must be construed and applied according to its terms. *Crawford* v. *Nies*, 224 Mass. 474. *Eliot* v. *Trinity Church*, 232 Mass. 517.

The clause at the end of paragraph eight which conferred upon the trustees direction and supervision of the publication of the Quarterly and all tracts and pamphlets, "reserving the right to make such changes as I may think important," is not a reservation of a general or special power of revocation of the trust itself or of any of its terms or provisions. The context shows that that clause refers only to the direction and supervision of the trustees over publications. Its scope and force are confined to the particular subject matter of that paragraph. It vested in the donor the right of modifying and altering the publications to be issued "to promote the best interests of the Cause." The power there retained concerned the publications and did not extend to the whole frame of the trust.

The words "First Members" occur twice in the trust deed, in paragraph four and in paragraph ten. The context in paragraph four is that the trustees shall keep accurate books of account and shall pay all expenses of the publishing business and "Once in every six months . . . shall account for and pay over to the treasurer of 'The First Church of Christ, Scientist, in Boston, Mass.,' the entire net profits of said business. . . . Said treasurer shall hold the money so paid over to him subject to the order of 'The First Members' of said Church, who are authorized to order its disposition only in accordance with the rules and by-laws contained in the Manual of said Church." The "First Members" of that church thus were constituted by the trust deed the sole body by which the net income of the publishing business as conducted by the trustees could be disbursed. Confessedly the net profits thus paid over have been very large in the aggregate. They must constitute a substantial element in the promotion and extension of Christian Science as taught by its leader. The First Members were an integral part of the organization of "The First Church of Christ, Scientist." They were selected for that reason. They were not co-ordinate, subsidiary, ancillary trustees. They were too numerous to qualify as trustees. Their duty was to disburse the net income, not in conformity to their own judgment, but

only in accordance with the rules and by-laws contained in the
manual of that church. In the earliest edition of the manual, by
which that church was governed, and in all subsequent editions,
there is printed as a foreword an extract from the writings of Mrs.
Eddy to the effect amongst other matters that the "Rules and
By-laws in the Manual . . . were impelled by a power not one's
own, were written at different dates, and as the occasion required."
The edition of the manual in use on January 25, 1898, the date of
the trust deed, was designated the seventh. It was different in
material particulars from those which had preceded it. It is mani-
fest that the trust deed was intended to be made subject, so far
as it concerned the officers of the church and their powers and
duties touching the disbursement of the net income paid by the
trustees to the treasurer of the church, to such changes as the
occasion might require to be made in the manual. If the words
"First Members" in this connection in paragraph four are given
a rigid, fixed and unchangeable meaning, then the trust must
come to an end when "First Members" are abolished as a part of
the church. If "First Members" have been irrevocably estab-
lished as an essential part of the machinery by which alone the
trust can be carried out, and if for any reason that machinery
breaks down or becomes incapable of operation, then the trust
itself would fall. *Bullard* v. *Shirley,* 153 Mass. 559, 560. *Teele*
v. *Bishop of Derry,* 168 Mass. 341, 342. Such a result ought not
to be reached except for most compelling reasons, after the trust
has been established and executed for so many years. No such
compelling reasons are found in this record. The plain intent of
the founder of the trust is that the net income must be used to
promote the religion of Christian Science as taught by Mrs.
Eddy even though "First Members" may pass out of existence.
The conclusion is unescapable that in this connection the words
"First Members" had no hard and fast meaning, but were used
in a broad sense to designate a body connected with and forming
a part of that church, and to comprehend whatever body might
from time to time exercise in accordance with the ecclesiastical
laws of the Christian Science denomination the functions then
exercised by "First Members." Since the First Members have
been abolished and all their powers transferred to the board of
directors, it must follow that the directors are authorized to exer-

cise the functions vested in "First Members" under paragraph four of the trust deed.

The meaning of the words "First Members" in this connection is a significant aid in determining the meaning of the same words upon their second occurrence in paragraph ten of the trust deed. It is a well recognized principle of interpretation that the same words used in different places in the same instrument commonly have the same meaning and effect unless another meaning is demanded by the context. *Hall* v. *Hall,* 209 Mass. 350, 353. *Attorney General* v. *Armstrong,* 231 Mass. 196, 211. *Raymer* v. *Tax Commissioner,* 239 Mass. 410.

The second occurrence of the words "First Members" in the trust deed is in paragraph ten. The sentence there is "The First Members together with the directors of said Church shall have the power to declare vacancies in said trusteeship for such reasons as to them may seem expedient." The precise point is whether the power of removal is gone if there are no longer any "First Members." Although the trustees under the trust deed were given extensive powers concerning the publication of the so called literature of the church, nevertheless they were not the final arbiters concerning these matters, because they might be removed from office by other church authorities "for such reasons" as to such other church authorities "may seem expedient." The soundness of the reasons for such removal is not made subject to review or revision by any other church tribunal, body or officer. The expediency of the reasons moving to that action are left by the deed wholly to the church authorities therein named. No discussion is needed to demonstrate that this power of removal was comprehensive, drastic and final. It is an important feature of the trust deed.

The power of removal of a trustee according to the trust deed was vested in "The First Members together with the directors of said Church." These are ecclesiastical terms. They describe authorities of The First Church of Christ, Scientist, in Boston, as they were then constituted and established. Mrs. Eddy was the founder of that church. She was its pastor emeritus. It is manifest that so long as she lived the polity of that church might be modified or changed. Membership in the church, classification of members, voting rights and officers, might be altered. Existing boards might be abolished and others created. The executive

and disciplinary powers of the church, its officers and members, might be divided, consolidated and redistributed. They might be vested in one or several boards, officers or bodies. Of course the terms of the trust deed cannot be varied, but its words are to be interpreted with reference to the subject matter to which they relate. It seems manifest to us that all parties to the trust deed used the words "First Members" and "directors" in paragraph ten of the trust deed with the significance, which they had acquired in Christian Science usage, and with the knowledge that, according to the practices of that church, duties imposed on them might be shifted to others connected with the church. Those words comprehended at the time they were used all possessed of authority to control the affairs of the church. They were used in a generic sense. They included such authorities even though their number and descriptive titles might change. The "First Members" did not include all members of the church. Those who united with the church by admission did not thereby become "First Members." The "First Members" were those who were made such at the meeting for the organization of "The First Church of Christ, Scientist," and those who subsequently were by these First Members voted into their fellowship. "First Members" alone possessed voting power. The church was in its infancy as a religious sect. Its founder was active. The deed of January 25, 1898, is itself evidence of a hope and expectation of growth of the church and of the sect. It is a familiar principle of legislation, illustrated by numerous statutes, that one board, commission or other body may be abolished and its powers and duties transferred to other and succeeding officers. No doubt has been raised concerning the validity of such statutes. Ecclesiastical denominations have like power as to the establishment of their officials, the description of their duties, the limits of their authority and the modification and alteration of these matters according to their own system of government. The conditions attendant upon the execution of the deed of January 25, 1898, indicate that its words "First Members together with the directors of said Church" were not used by the parties to the deed with the purpose of fixing inflexibly the persons or boards bearing those names in the church organization as alone capable of exercising power of removal of trustees. Thus to construe the words would be to stick

to the form and to ignore the substance. The fair interpretation of the words is that those possessing the ecclesiastical functions at the time vested in "First Members" and directors should be the depositaries of the power of removal by whatever names they might be called, and however their number might fluctuate according to the polity of the church. In a more complete and accurate drafting of the deed of January 25, 1898, this might have been set forth in appropriate language. It is implied under all the circumstances from the words used. The intent of the parties to the trust deed as declared by the words used was not that the body known as "First Members" must be kept alive for all time in order that the power of removal of a trustee should continue, if at any time in the government of the church and in accordance with its practices it should be deemed wise to abolish "First Members" and transfer their duties to others. If such members should cease to exist under the church organization, the power of removal of a trustee would not thereby be extinguished. The parties to the instrument here in question were the founder of a sect of Christianity and three of her followers. The dominating purpose of the instrument was to promote and propagate the interests of that religious sect. As ancillary to that general object, power of removal of the trustees created by that instrument was established. It was vested in two constituent bodies of "The First Church of Christ, Scientist," then organized and existing. The power of removal of the trustees was an essential part of the trust deed. The promotion of Christian Science as taught by Mrs. Eddy was the end and aim of the trust. To that regnant design all other provisions, not in themselves made fixed and unchangeable, must yield. Christian Science as thus taught was disclosed by the writings of the founder. The ecclesiastical organization established by her for the teaching and dissemination of Christian Science was "The First Church of Christ, Scientist." She did not reserve to herself the power of removal of the trustees but she reposed that authority in "First Members" and directors of that church. That church was the beneficiary of the trust. That church as shown by the manual at the time of the execution of the trust deed of January 25, 1898, was the dominant church in Christian Science. It was the beneficiary of all net profits arising from the management of that trust. Its board of directors was

clothed with extensive powers concerning its management. Its manual appears to be a vital part of Christian Science. The presumption is inevitable that all the parties to the trust deed of January 25, 1898, intended. that the power of removal should be vested in the responsible representatives of The First Church of Christ, Scientist, however they might be described or denominated, provided they succeeded to the powers and exercised the functions of First Members and directors. The inference is irresistible that they had in mind the mutability of the names and functions of church officers and intended that the power of removal should vest in such representatives of The First Church of Christ, Scientist, as might from time to time exercise according to the government of that church the functions and possess the powers of those named in the trust deed as having the power of removal. The vote of the First Members of January 10, 1901, embodied in a by-law to the effect that the business of the church theretofore transacted by them be done in the future by the directors, was not an attempt to delegate the trust power to participate in the removal of a trustee vested in them by the deed of January 25, 1898. It did not stand alone. It was a part of a large transaction. It was one step in the process of change according to the polity of the church whereby "First Members" were abolished and their duties and authorities vested in the directors.

The number of "First Members" of the church on January 25, 1898, when the trust deed was executed is not disclosed in the record. It is, however, fairly inferable that they were numerous, and liable to constant fluctuation by reason of death and election of new members. Therefore Mrs. Eddy could not have placed special confidence in their discretion as individuals. The principle that, when the element of personal choice is found, the exercise of the power must be confined to the person or persons selected and is not transmissible has no application. *Sells* v. *Delgado*, 186 Mass. 25, 27. The naming of directors and first members in paragraph ten of the trust deed as having power of removal was not an appointment of particular persons as repositories of authority but a designation of two classes of church functionaries in whom the power was to vest and survive, no matter who the individuals might be. The power conferred upon these two classes of church functionaries "to declare vacancies in said trusteeship for such

reasons as to them may seem expedient" imposed a continuing duty to maintain a certain intimacy of knowledge as to the work of the trustees in order to be able constantly to act intelligently. It was a power coupled with a trust. The obligation rested upon them to cause the provisions of the trust deed to be executed in accordance with its terms and the intent and purpose of the donor there expressed to be administered faithfully. This duty was given to the donees of the power by virtue of their respective positions in the church. In a sense this position was kindred to that of trustees clothed with a power coupled with an interest, in the survivors of whom the authority continues for the purpose of effectuating the object of the power. *Gould* v. *Mather,* 104 Mass. 283, 286. *Parker* v. *Sears,* 117 Mass. 513. *Chandler* v. *Rider,* 102 Mass. 268. *Coffin* v. *Attorney General,* 231 Mass. 579. *Wilson* v. *Snow,* 228 U. S. 217.

These circumstances distinguish the case at bar from *Boston* v. *Doyle,* 184 Mass. 373. In that case the holders of certain public offices had been designated in a trust instrument as members of a board of managers of a trust fund, and the offices thereafter were abolished and other offices created whose incumbents succeeded in most particulars to the same public duties. It was held that it became the duty of the court to appoint managers to take the places of those holding the original offices and designated by the donor as the board of managers.

The report of the master shows that the "First Members" have been disbanded according to the forms of church organization and government prevailing in "The First Church of Christ, Scientist." They are no longer in existence. They ceased to have any temporal power in 1901, and were disbanded in 1908. The means by which this was accomplished are not of consequence further than to know that they were those recognized, adopted and approved without dissent by the ecclesiastical body known as The First Church of Christ, Scientist. That result has been accepted by all Christian Scientists. It had the approval of Mrs. Eddy if it was not suggested by her. It has been embodied in every edition of the Church Manual since 1908. It would be difficult to conceive more convincing proof that the church as an organization had abolished "First Members" and conferred their powers, at least so far as related to removal of trustees, upon the

directors. Votes and by-laws to that end were accepted with entire unanimity at the time and there has been unbroken acquiescence in their regularity for many years. The "First Members" have not become incapable of participation in the exercise of the power of removal of trustees merely as the result of their own act. The governing power of the church at the suggestion or with the approval of Mrs. Eddy has brought about their elimination in connection with removals, because substantially all their power has been transferred to the directors. That has been accomplished by ecclesiastical methods accepted without question by all the church. It is a matter as to which the action of the church according to its rules is final. So far as concerns the power of removal of a trustee under the trust deed of January 25, 1898, the organization of the church in accordance with its polity has consolidated those powers, previously shared by the "First Members" and the directors in concurrence, and placed them wholly in the directors. Interpreting the words of the trust deed according to their true meaning, we are of opinion that the power of removal thereby survived and became vested in the board of directors. It exists in them by virtue of their office and the trust reposed in them by the deed of January 25, 1898, and the duties placed upon them by the church itself. *Carter* v. *Papineau*, 222 Mass. 464. *Attorney General* v. *Armstrong*, 231 Mass. 196.

The "directors of said church," as those words are used in the trust deed of January 25, 1898, do not in our opinion refer to the board established by the deed of September 1, 1892, but to the officers constituting the ecclesiastical board of directors under the polity of the church. The reasons already stated respecting "First Members" lead to this conclusion. No reference to the deed of September 1, 1892, is found in the trust deed of January 25, 1898. The latter deed throughout relates to those connected with The First Church of Christ, Scientist, either as "First Members" or directors. These terms are ecclesiastical. When therefore the board of directors under the practice of the church was increased in membership, it became vested with powers formerly exercised by the four directors, so far as concerns the power of removal in the trust deed of January 25, 1898. It is unnecessary to determine in this connection whether the board of directors constituted a corporation or not. For the purposes of this decision the finding

of the master that they never became a corporation is accepted.

The result is that the board of five directors have the power, if they act in accordance with law and with the terms of the trust deed of January 25, 1898, to effect the removal of a trustee under that deed.

The conclusion that the power of removal of a trustee is now vested in the board of five directors is contrary to that of the master, but it is in substance and effect the application of different legal principles to the facts found by the master. The facts found by him are accepted in their entirety. The result which has been stated follows in law from those facts.

One being absent and one refusing to vote, the three remaining directors adopted a resolution removing the plaintiff Rowlands from his position as one of the trustees under the deed of January 25, 1898. This resolution is somewhat long and recites numerous reasons. One of these is that Rowlands "evidently has other interests which prevent him from giving sufficient time and attention to the business of the Christian Science Publishing Society." Respecting this the master was "unable to regard the charge made as one actually believed to be true, by the directors who made it, after due inquiry into the facts, or as one which they would have considered sufficient for his removal had they not desired to remove him for other reasons." The other reasons assigned in the resolution of removal grew out of a controversy, arising some years after the death of Mrs. Eddy, between the trustees and directors regarding the extent to which the former were subject to the control and supervision of the latter. Seemingly the controversy started because the directors requested that a pamphlet called "Purification" be not sent out until authorized by them. Nevertheless the business manager sent out the pamphlets on the ground that it was "his highest understanding of Principle to follow the original order of the trustees" to that effect notwithstanding the request of the directors. Then the controversy widened into a general discussion of the respective powers and duties of the two boards under the deed of trust of January 25, 1898, and under the Church Manual. The controversy appears to have centred about the meaning of certain sections of the Church Manual and the extent to which its provisions authorized the directors to supervise the matter to be printed and sent out by the trustees, and to what

extent the trustees were required to heed the provisions of the
Church Manual. Into the details of that controversy, it is not
necessary to enter. Out of it has grown the present litigation.
The finding of the master is that "I am unable to hold either
that the final authority claimed by the Directors is so clearly
established by the deed itself and the provisions of the Manual
that no reasonable denial of it was possible, — or that the Direc-
tors' determination that they had such final authority was con-
clusive upon the trustees. Whatever the right conclusion may be
upon the question whether such final authority belonged to the
Directors or not, it was by no means a question regarding which
no honest difference of opinion was possible." This is another
way of saying that an honest difference of opinion was possible.
Therefore if the directors were honest in their view, they cannot
be said to be without authority to decide that it was expedient
with reference to the welfare of the trust to remove one of the
trustees.

The words of the trust deed are that vacancies in the trustee-
ship may be declared "for such reasons as to them may seem
expedient." That is a broad phrase. "Expedient" is a word of
large import. It comprehends whatever is suitable and appro-
priate in reason for the accomplishment of the specified object.
In this connection it includes whatever may rationally be thought
to conduce to the welfare of the trust. It means that the genuine
judgment of the named church authorities honestly exercised is
to prevail. The discretion of those possessing the power of re-
moval, when applied in good faith, is not subject to re-examination
in respect of its wisdom. The judgment of the court cannot be
substituted for the discretion of the constituted authorities, when
fairly exercised. Whether the decision be right or wrong is not
for the courts to decide. The power of removal cannot be put
forth maliciously, whimsically, or capriciously. The function of
the court is to ascertain whether the terms of the deed of trust
have been observed, whether the proceedings have been regular,
whether the cause assigned is one sufficient to warrant removal,
whether fair opportunity has been accorded the trustee to present
his side of the matter so as to satisfy the requirements of natural
justice, whether the decision is within the scope of the power con-
ferred and whether the final action appears to have been in the

exercise of good faith and an honest judgment or to have been arbitrary and lacking in the ordinary elements of fairness. *Proctor* v. *Heyer*, 122 Mass. 525, 529. *Grosvenor* v. *United Society of Believers*, 118 Mass. 78, 91. *Leverett* v. *Barnwell*, 214 Mass. 105, 108. *Richards* v. *Morison*, 229 Mass. 458, 461. This does not necessarily imply that a formal hearing must be had before removal. *O'Dowd* v. *Boston*, 149 Mass. 443. *Attorney General* v. *Donahue*, 169 Mass. 18, 22. *Sims* v. *Police Commissioner for Boston*, 193 Mass. 547, 549. Circumstance may be conceived to exist, which would render a hearing futile. Nevertheless a hearing ordinarily is important to the decision of such a question. *Burgess* v. *Mayor & Aldermen of Brockton*, 235 Mass. 95, and cases collected at page 100. *Smyth* v. *Phillips Academy*, 154 Mass. 551, 557. *Gray* v. *Christian Society*, 137 Mass. 329, 331.

It hardly can be held to be a capricious or arbitrary exercise of power for the directors to determine that, because a radical difference of opinion as to the interpretation of the Church Manual existed between them and the trustees, the welfare of the trust required the removal of one of the trustees. It is not for us to pass upon the wisdom of such action. The only question is whether it was arbitrary and capricious and not in good faith. One of the grounds stated in the resolution of removal was that Mr. Rowlands did not recognize the importance of "promoting the interests of Christian Science by following the directions given by Mrs. Eddy in our Church By Laws" and had shown a disposition to pervert their meaning and annul their effect.

Respecting the good faith of the directors in this matter, the master finds that "So far as the assigned reasons accuse Rowlands of failure to devote time enough to the Publishing Society's business, or were made to appear as reasons requiring his removal only, and not equally the removal of his co-trustees, it may be said that they were not reasons assigned in good faith. But that the Directors who adopted the resolution honestly believed themselves to be exercising a power belonging to them, and for sufficient reasons, whether those assigned or not, I find no reason to doubt." The directors cannot be said to have acted arbitrarily or capriciously in removing one only of the trustees, because the same grounds appear to have existed for removing all the trustees. Sound judgment may have dictated the removal of one, and not

all. The last sentence of this finding to the effect that the directors honestly believed they were acting within their power and honestly believed their reasons to be sufficient is inconsistent with bad faith or fraud in its common acceptation. This is a finding of good faith on the part of the directors as to all the reasons stated except the one for failure to devote time enough to the business.

It is not a finding that the other reasons given were tainted or affected by the one as to failure of Mr. Rowlands to devote time enough to the business. Those other reasons honestly assigned were such as, within the power vested in the directors, warranted them in making a removal. It is their honest judgment upon the question of expediency in this regard which must prevail and not that of any other body or magistrate.

The circumstance that no formal hearing was held is not decisive against the validity of the removal. While ordinarily one, whose conduct is called in question, ought to be given an opportunity to be heard in his own defence, it is apparent that the long controversy between the trustees and the directors had brought out clearly the points of difference between them. The grounds of removal, on which the action of the directors can stand, had been in substance fully debated orally and in writing and Mr. Rowlands had stated his point of view forcibly and at length.

A majority of the directors were present at the meeting and voted for the removal. That was sufficient in form to effect a removal. A unanimous vote was not required.

The result is that, upon the application of the principles of the law to the facts found by the master, the removal of Mr. Rowlands as one of the trustees was effected.

While this case was pending before the single justice the Attorney General filed a petition for leave to intervene and to file an answer. That was denied. No exceptions were saved. No appeal was taken. Before the full court the Attorney General has filed a suggestion that the court is without jurisdiction to determine the issues raised on this record or to enter a final decree on the ground that the suit relates to a public charitable trust or trusts and that the Attorney General as the representative of the public beneficiaries is a party essential to jurisdiction over the subject. The point thus presented is not whether the Attorney General may be a proper party or whether in the exer-

cise of judicial discretion he ought to be permitted to become a. party. Those questions were raised by his petition to intervene and, having been decided adversely to his contention without preservation of any right of review, cannot now be considered.

The court has taken jurisdiction of numerous cases, indistinguishable in this particular from the case at bar, to which the Attorney General was not a party. *Cary Library* v. *Bliss,* 151 Mass. 364. *Morville* v. *Fowle,* 144 Mass. 109. *Teele* v. *Bishop of Derry,* 168 Mass. 341. *Worcester City Missionary Society* v. *Memorial Church,* 186 Mass. 531. *Codman* v. *Brigham,* 187 Mass. 309. *Hubbard* v. *Worcester Art Museum,* 194 Mass. 280. *Ware* v. *Fitchburg,* 200 Mass. 61. *Crawford* v. *Nies,* 220 Mass. 61; *S. C.* 224 Mass. 474. *First African Methodist Episcopal Society* v. *Worthy,* 232 Mass. 331. It is the duty of the court of its own motion to examine its jurisdiction before proceeding to any decision. *Eaton* v. *Eaton,* 233 Mass. 351, 364, and authorities there collected. It is hardly to be thought that so many cases arising over so long a period of time could have been decided inadvertently. These adjudications without joining the Attorney General as a party are almost conclusive of the jurisdiction of the court even though the point has not been discussed.

The issue here to be settled (as has been already stated) is whether one of the trustees under the deed of January 25, 1898, can be and has been removed by the directors. The public interests must be directly and essentially, rather than remotely and accidentally, involved as to some distinct issue in order to prevent the cause from proceeding to a decision without the presence of the Attorney General as a party. *Jackson* v. *Phillips,* 14 Allen, 539, 579. *McKenzie* v. *Trustees of Presbytery of Jersey City,* 1 Rob. (N. J.) 652, 683 to 686. *Esquimalt & Nanaimo Railway* v. *Wilson,* [1920] A. C. 358.

Whether the power of removal of one of the trustees has been exercised according to law is a matter of direct interest to the parties to the present proceeding. The absence of the Attorney General does not affect the jurisdiction of the court to proceed to a final determination on the merits of the issues raised between the immediate parties. Such decision will not directly pass upon interests of which the Attorney General in his official capacity is the representative.

No question is involved in this suggestion of the Attorney General either under the Constitution of this Commonwealth or under the Fourteenth Amendment to the Federal Constitution. Cases like *Riverside & Dan River Cotton Mills* v. *Menefee,* 237 U. S. 189, and *McDonald* v. *Mabee,* 243 U. S. 90, plainly depend upon a principle different from that here raised.

On April 6, 1920, after the filing of the master's report, Daisy L. Krauthoff and Edwin A. Krauthoff petitioned, in behalf of themselves and such other members of "The First Church of Christ, Scientist," as might elect to come in, for leave to file exceptions to the master's report, a motion to recommit to the master and a motion to postpone. They sought to except to the report on objections filed but omitted from exceptions by the defendants. A decree was entered denying this petition and the petitioners claimed an appeal. The petitioners were not parties to the proceeding and therefore had no standing to present such a motion. The master's report was filed on March 6, 1920. The time allowed by Equity Rules 31 and 32 for filing exceptions thereto had expired. *Smedley* v. *Johnson,* 196 Mass. 316. They had no right to appeal from the denial of their motion. *Martin* v. *Tapley,* 119 Mass. 116. *Ex parte Leaf Tobacco Board of Trade, petitioner,* 222 U. S. 578.

On October 20, 1920, which was about two months after the reservation of the case for decision by the full court, Mr. and Mrs. Krauthoff filed a motion in behalf of themselves and such other members of the church as might desire to join, to be admitted as parties to the suit and to refile the motions before filed and denied. There was no error in the denial of this motion. The case was pending before the full court. The single justice could not then deal with such questions. *Burbank* v. *Farnham,* 220 Mass. 514, 515, 516. *Old Dominion Copper Mining & Smelting Co.* v. *Bigelow,* 203 Mass. 159, 221. The motion also was addressed under the circumstances disclosed on the record to the discretion of the court, which cannot be held to have been abused. *New York Bank Note Co.* v. *Kidder Press Manuf. Co.* 192 Mass. 391, 408. *Credits Commutation Co.* v. *United States,* 177 U. S. 311, 314–317. Opinion by Lurton, Circuit Judge, in *Toler* v. *East Tennessee, Virginia & Georgia Railway,* 67 Fed. Rep. 168, 172. *New York* v. *Consolidated Gas Co.* 253 U. S. 219. There appears to have been no adversary relation between these petitioners

and the directors. It was the duty of the latter to protect the interests of the members of "The First Church of Christ, Scientist." *John Hancock Mutual Life Ins. Co.* v. *Lester,* 234 Mass. 559, 562.

The result is that the exceptions of the defendants to the master's report, so far as they relate to his rulings that the directors had no power under the deed of January 25, 1898, to remove a trustee and that the removal of Mr. Rowlands was ineffectual, must be sustained. On the facts found by the master, in the light of the principles of law here found to be controlling, the plaintiffs cannot maintain their bill.

In order to decide the fundamental issues raised on this record, it is unnecessary to consider the question whether Mr. Dittemore or Mrs. Knott is a director. That issue is directly involved in another suit.

The exceptions of Emelie B. Hulin have been waived and need not be considered.

*Suggestion of the Attorney General denied.*
*Both appeals of E. A. and D. L. Krauthoff dismissed.*
*Exceptions of Emelie B. Hulin waived.*
*Bill dismissed.*