PATRICK J. FLAHERTY & others *vs.* CHESTER C. GRAY
& others.

Suffolk.    March 7, 1956. — May 4, 1956.

Present: QUA, C.J., RONAN, WILKINS, COUNIHAN, & WHITTEMORE, JJ.

*Trust,* Pension trust, Construction.  *Pension.*

A certain agreement entered into by a group of companies establishing a
trust fund for the payment of retirement benefits to their employees
and requiring the companies to make specified periodic contributions
to the fund contemplated an actuarially sound fund, and the trustees
thereof had no duty to pay such benefits therefrom to eligible retired
employees of a participating company which was in default as to a
part of the contributions required of it.

BILL IN EQUITY, filed in the Superior Court on March 16,
1955.

The suit was heard by *Kirk, J.*

*Paul V. Power, (Nicholas U. Sommerfeld* with him,) for
the plaintiffs.

*John E. Laursen,* for the defendants.

WILKINS, J.    Effective January 1, 1954, there was exe-
cuted an instrument entitled, "Trust Agreement Estab-
lishing The Boston Newspaper Retirement Fund."   The
contracting parties were four newspaper publishers, namely,
Boston Herald-Traveler Corporation, The Hearst Corpora-
tion, Globe Newspaper Company, and Post Publishing
Company; three companies associated with them, namely,
Wilson Tisdale Co., Blinn Morrill Co., and D. S. Wood-
berry Co.; and five trustees, one appointed by each news-
paper company, and the fifth by the four so chosen.   This
bill in equity for a binding declaration as to the duties of
the trustees is brought by three trustees against the two
other trustees, the newspaper companies, the associated
companies, and individuals representative of various labor
unions.   The defendant Post Publishing Company (herein-
after called the Post) and the defendant Gray, the trustee

appointed by the Post, were the only defendants to file answers or to take issue as to the interpretation of the agreement. After hearing, the judge entered a final decree making an interpretation in accordance with the contention of the plaintiffs. The Post and Gray appealed. Certain facts were agreed in lieu of evidence, and the judge made "findings of fact in addition to statement of agreed facts." The evidence is reported.

We quote material portions of the agreement. "'Participating employers' means the following companies which are contributing to the Boston Newspaper Retirement Fund and the eligible employees of which share in the benefits provided hereunder: [Here follow the names of the four newspaper companies and the three associated companies]." (Section II, paragraph 1.) Each participating employer is to pay into the trust fund a sum not exceeding $1.75 a week for each employee covered. (Section IV, paragraph 1.) "An employee shall be entitled to retire hereunder on any first day of month which coincides with or is subsequent to the later of (a) his sixty-fifth (65th) birthday, or (b) January 1, 1955; provided that on the working day immediately prior to such date he so retires he is in the employ of a participating employer and has at least fifteen (15) years of continuous credited service . . . ." (Section VI, paragraph 1.) The monthly retirement benefits range from $30 to $50 a month. (Section VI, paragraph 4.) "No employee or retired employee, nor any person claiming by, through, or under any of them, shall have any right, title, or interest in or to the trust fund except the right of an employee to a benefit as expressly provided hereunder . . . nor shall a participating employer be entitled to the return of any part of its contributions to the trust fund upon the withdrawal from its services of an employee, or upon termination of the plan and trust agreement or otherwise." (Section IX.) "Each participating employer reserves the right to withdraw from participation hereunder or to discontinue its contributions as of any anniversary hereof on or subsequent to January 1, 1959 . . . . In event a par-

ticipating employer shall so withdraw from participation hereunder it shall not be entitled to the return of any contributions which it has made hereunder." (Section XI, paragraph 2.)

The present controversy arises from the failure of the agreement to contain a specific provision as to the duties of the trustees in the event one of the employers is in default in making contributions to the fund.

As of December 31, 1954, the newspaper publishers, other than the Post, and the three associated companies had contributed $209,511.40, and the unions $687.40, making a total of $210,198.80. As of the same date the Post was obligated to pay into the fund $40,925.50. As of April 30, 1955, the newspaper publishers, other than the Post, and the associated companies had contributed $326,964.65; the unions had paid $967.75; and the total was $327,932.40. As of that date, the Post was in default in its contributions in the amount of $15,538.60, having made its one and only payment of $40,000 on January 24, 1955. As of May 1, 1955, the trustees had paid $8,570 in retirement benefits, and had retained $2,750 which would have been paid as benefits to retired employees of the Post had the Post not been in default. The foregoing facts were agreed.

Additional findings made by the judge are: "It is obvious that contributions to the fund were designed to serve two purposes: — (a) to pay current benefits, and (b) so to endow the plan that it could be said with actuarial accuracy that as each eligible employee retired the trustees could set aside sufficient money which, if prudently invested, would pay his pension for life. At the moment, the fund's income greatly exceeds its expenses. But month by month the number and aggregate amount of benefits will increase progressively, while the number and aggregate amount of contributions will remain substantially the same. Inevitably the time will come when intended benefits can be paid only because of the existence of an accumulated fund and its earnings. The creators of the plan knew that if all the promised contributions were not made all employees could

not be paid. While the margin of safety which the plan affords to meet liabilities may be said to be narrow, the fund would not be endangered if all subscribers observed their obligations. If one paper failed to make its contributions, and yet pension payments continued to be paid to all of its employees as they became eligible, a time would come when the plan would collapse. These observations were made known to the subscribers prior to the signing of the trust agreement by those who had made the actuarial study. The employees of the Post Publishing Company who have become eligible for retirement benefits under the trust agreement have been paid a total of $2,750 by the Post Publishing Company directly since January, 1955."

The final decree provided: "That the trustees . . . have no duty to make payment of the benefits provided for by Section VI of said agreement to the retired employees of an employer . . . who is in default in his payments required by Section IV . . . at the time said payments are required to be made under said Section IV although said retired employees are otherwise eligible to receive said payments." The final decree also ordered the Post to pay forthwith to the trustees $15,538.60 with interest and costs. We think that the decree was right.

There is no express provision as to the duties of the trustees in an important respect. In reading the agreement as a whole, there is also an ambiguity as to whether this omission was intentional. Parol evidence was, accordingly, admissible to determine, but not to add to or vary, the terms. "An omission to express an intention cannot be supplied by conjecture. But if the instrument as a whole produces a conviction that a particular result was fixedly desired although not expressed by formal words, that defect may be supplied by implication and the underlying intention of the founder of the trust may be effectuated, provided it is sufficiently declared by the entire instrument. Eustace v. Dickey, 240 Mass. 55, 72, 73, and cases there collected." Dittemore v. Dickey, 249 Mass. 95, 105. Spaulding v. Morse, 322 Mass. 149, 152–153. Scott, Trusts, § 164.1.

Testimony was admitted, without objection, of an expert on pension plans who had analyzed and evaluated this plan before the agreement was executed. That testimony and the findings based upon it show many of the attendant circumstances. These demonstrate the fallacy of the appellants' contention that the parties intended to provide for certainty in the payment of retirement benefits to all employees notwithstanding the fact their employer might be in default. According to the appellants' argument in this court, that certainty is for an indefinite period notwithstanding their answers hereinafter mentioned.

The definition in the agreement of participating employers as "companies which are contributing to the Boston Newspaper Retirement Fund and the eligible employees of which share in the benefits provided hereunder" (Section II, paragraph 1) goes far to substantiate the plaintiffs' contention that no payments should go to employees of the Post. The appellants' position as set forth in their answers seems to be that payments should be made to the eligible employees of the Post for as long, at least, as the $40,000 contributed by it is "sufficient to cover" its "proportionate share of the benefits provided for by Section VI." Such a position is untenable. The parties indubitably contemplated a fund which would be actuarially sound. The agreed facts disclose that all the employers in various union contracts made in 1954 undertook to accumulate "The Fund" until January 1, 1955, before which date they would "establish a plan which will best provide retirement benefits to eligible employees in accordance with a sound and self-supporting plan," and which would be presented to the Bureau of Internal Revenue for approval as an exempt fund.

The trust agreement itself shows that a sound funded plan was intended. "The operating and administrative expenses incurred by the trustees, including but not limited to, the cost of setting up of the trust fund on a sound actuarial basis . . . shall be paid from the funds of the trust fund." (Section III, paragraph 3 [f].) "The trustees shall employ an actuary at such times as are necessary . . . and may

employ such . . . actuarial services as they deem expedient
in carrying out the provisions of the plan." (Section III,
paragraph 3 [g] [iv].) "The trustees shall have prepared,
from time to time, but not less frequently than once every
five (5) years, an actuarial valuation of the plan by a qualified
actuary, who shall submit a report to the trustees with rec-
ommendations. All actuarial computations required under
the plan and trust agreement shall be made upon such as-
sumed rates of interest, mortality, and other actuarial com-
ponents and according to such methods of computation as
the trustees with the advice of the actuary may determine
to be proper." (Section X.)

We need hardly look at the judge's findings or the evi-
dence to be certain that the parties knew that, should the
agreed contributions not be made, the time would come
when all eligible employees could not be paid. We are also
sure that the agreement did not contemplate that a breach
by one employer could force a collapse of the whole fund.
Two provisions relied upon by the appellants impress us as
lacking in present significance. One is that part of Section
IV, paragraph 2, to the effect that no participating employer
or trustee "shall be liable if the trust fund shall be insuffi-
cient to provide for the payment of all benefits." The other
is that part of Section XI, paragraph 3, prescribing that in
the event of termination if there are insufficient assets to
continue payment to employees already retired, the fund
shall be proportionately allocated to such employees.

More significant, in our opinion, are those provisions in
Section XI, paragraph 2, which preclude an employer's
withdrawal from participation before January 1, 1959, and
which, in that event, deny it a right to the return of any of
its contributions. Not only are those provisions in aid of
an actuarially sound plan, but they shed light on the ques-
tion before us. Should an employer not withdraw from
participation on or after January 1, 1959, but should merely
discontinue contributions, it would have no greater right
to a return of its contributions than would the employer who
does withdraw on or after that date. The situation prior

to January 1, 1959, is covered by Section IX, which denies to an employer the return of any part of his contributions "upon the withdrawal from its services of an employee, or upon termination of the plan and trust agreement or otherwise." Continued payments to retired employees of the Post would, when viewed from the soundness of the fund, closely resemble withdrawal of contributions. We think that under the agreement both should be treated the same.

One other suggestion merits only brief comment. It is argued that no fund which is actuarially sound at the outset could possibly collapse as found by the judge, for, it is said, the employers are legally obligated to make contributions. The obvious answer is that an obligor is not necessarily solvent, and judgments, executions, and actions to obtain them, with the attendant delay and expense, are not the equivalent of the cash contributions contemplated.

*Decree affirmed with costs of the appeal.*